# Exhibit 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------X

VANDELAY INDUSTRIES TM LLC,
VANDELAY INDUSTRIES KM LLC,
VANDELAY INDUSTRIES AM LLC,

                    Plaintiffs,

                 -against-

BITWISE HOLD 10 PRIVATE INDEX FUND, LLC,
BITWISE ASSET MANAGEMENT, INC., BITWISE 10
CRYPTO INDEX FUND, BITWISE INVESTMENT
ADVISORS, LLC, HUNTER HORSLEY, MATT
HOUGAN, TEDDY FUSARO, and JAMES FARRELL,

                   Defendants.

-------------------------------------------------------------------X

Index No.:

Date Purchased:

**SUMMONS**

Venue is based on CPLR 503(a).
Plaintiffs designate New York
County as the place of trial.

**TO THE ABOVE-NAMED DEFENDANTS:**

      **You are hereby summoned** to answer the complaint in this action, and to serve a copy of

your answer, or, if the complaint is not served with this summons, to serve a notice of appearance

on plaintiff's attorneys within twenty (20) days after the service of this summons, exclusive of the

day of service, where service is made upon you personally within the state or within thirty (30) days

after completion of service where service is made in any other manner.  In case of your failure to

appear or answer, judgment will be taken against you by default for the relief demanded in the

complaint.

Dated: Uniondale, New York
       June 21, 2024

                         WESTERMAN BALL EDERER
                         MILLER ZUCKER & SHARFSTEIN, LLP

                         By: _____
                           Andrew S. Lewner, Esq.
                         1201 RXR Plaza
                         Uniondale, New York 11556
                         (516) 622-9200
                         alewner@westermanllp.com
                         *Attorneys for Plaintiffs*

Case 1:24-cv-07554    Document 1-1    Filed 10/04/24    Page 3 of 75

To:    BITWISE HOLD 10 PRIVATE INDEX FUND, LLC\
       400 Montgomery St., Ste 600
       San Francisco, California, 94111

       BITWISE ASSET MANAGEMENT, INC.
       400 Montgomery St Ste 600
       San Francisco, California, 94111

       BITWISE 10 CRYPTO INDEX FUND
       400 Montgomery St Ste 600
       San Francisco, California, 94111

       BITWISE INVESTMENT ADVISORS, LLC,
       400 Montgomery St Ste 600
       San Francisco, California, 94111

       HUNTER HORSLEY
       c/o BITWISE INVESTMENT ADVISORS, LLC,
       400 Montgomery St Ste 600
       San Francisco, California, 94111

       MATT HOUGAN
       c/o BITWISE INVESTMENT ADVISORS, LLC,
       400 Montgomery St Ste 600
       San Francisco, California, 94111

       TEDDY FUSARO
       19 W 44th Street, Suite 715
       New York, NY 10036

       JAMES FARRELL
       c/o BITWISE INVESTMENT ADVISORS, LLC,
       400 Montgomery St Ste 600
       San Francisco, California, 94111

0304317

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------X
VANDELAY INDUSTRIES TM LLC,                          Index No.:
VANDELAY INDUSTRIES KM LLC,
VANDELAY INDUSTRIES AM LLC,

                           Plaintiffs,                    **VERIFIED COMPLAINT**

            -against-

BITWISE HOLD 10 PRIVATE INDEX FUND, LLC,
BITWISE ASSET MANAGEMENT, INC., BITWISE 10
CRYPTO INDEX FUND, BITWISE INVESTMENT
ADVISORS, LLC, HUNTER HORSLEY, MATT
HOUGAN, TEDDY FUSARO, and JAMES FARRELL,

                          Defendants.
------------------------------------------------------------------X

        Plaintiffs Vandelay Industries TM LLC, Vandelay Industries KM LLC and Vandelay

Industries AM LLC (together "Vandelay Industries" or "Plaintiffs"), by and through their

attorneys, Westerman Ball Ederer Miller Zucker & Sharfstein, LLP, as and for their Verified

Complaint against Bitwise HOLD 10 Private Index Fund, LLC (the "Fund"), Bitwise Asset

Management, Inc. ("BAM"), Bitwise 10 Crypto Index Fund ("BITW"), and Bitwise Investment

Advisors, LLC ("BIA") (collectively, the "Corporate Defendants"), Hunter Horsley ("Horsley"),

Matt Hougan ("Hougan"), Teddy Fusaro ("Fusaro"), and James Farrell ("Farrell") (collectively,

the "Individual Defendants") (Corporate Defendants and Individual Defendants collectively,

"Defendants"), allege as follows:

## NATURE OF THE CASE

        1.    This action arises out of the egregious, self-serving and wrongful actions of

Defendants to prey on investors such as Plaintiffs,[1] the Mukamal family.  The Mukamal family

---

[1] Plaintiffs are three single member entities, each run by a member of the Mukamal family.

consists of Kathleen, a retired nurse and homemaker, and her two sons, Theodore and Andrew. Theodore is an attorney, and Andrew is a fashion stylist.

2. Between February and March 2018, Plaintiffs entered into a series of subscription agreements, pursuant to which Plaintiffs invested approximately $1,300,000 into the Fund.

3. The Fund was formed one year earlier, in 2017, and was managed by BIA, a wholly owned subsidiary of BAM, a brand-new company formed in the same year and primarily led by co-founders, defendant Hunter Horsley, then 27 years old, and defendant Hong Kim, then 25 years old. Horsley and Kim had scant work experience and little to no management experience, but were backed by well-funded investors. In 2021, BAM was valued at $500 million with an investment of $70 million in 2021. It is backed by billionaire financiers such as Daniel Loeb's Third Point LLC, Daniel Och's Willoughby Capital and the hedge fund billionaire Stanley Druckenmiller along with private equity corporate titan Henry Kravis. The firm now manages approximately $3 billion dollars in assets.

4. The Fund was described as an expertly-managed cryptocurrency index fund that allowed investors to invest in cryptocurrencies while achieving diversification.

5. Because the fund was touted as having been "actively managed" by expert investors, investors in the Fund, including Plaintiffs, were charged a significant management fee (which, as discussed below, Defendants improperly coerced Plaintiffs to allow Defendants to increase by a whopping 25%).

6. Two years after Plaintiffs invested in the Fund, in 2020, Defendants, through BAM, announced their intention to convert the Fund from a limited liability company to a statutory trust, and sought the consent of its investors, including Plaintiffs, to do so. At that time, Defendants also announced other material changes to the Fund, including the nature of the

Case 1:24-cv-07554    Document 1-1    Filed 10/04/24    Page 6 of 75

investment changing from privately held to over the counter (known in the investment community as "OTC"), as well as a substantial increase in the management fee charged to investors. At the time of Plaintiff's investment, Defendants offered a reduced management fee for institutional investors, including Plaintiffs, of 2%, but as part of the conversion, Defendants substantially increased the management fee that they were charging investors by 25%!

7. The conversion from a fund that traded on the OTC market represented a material change in the fund, as OTC markets are generally considered to trade in a far more volatile manner due to their lower volumes.

8. Until that point, the Fund had never disclosed its intention to trade via OTC; indeed, Plaintiffs chose to invest in the Fund based specifically upon the representation that their investment would be privately placed and privately redeemable.

9. The Individual Defendants, through and as principals of the Corporate Defendants, represented that the conversion of the Fund was in their investors' best interest. In reality, the unfortunate truth is that Defendants acted in their own self-interest to the detriment of their investors, including Plaintiffs.

10. Defendants coerced investors, including Plaintiffs, to consent to the conversion through material misrepresentations and omissions. They led Plaintiffs, among others, to believe that in addition to trading OTC, Fund participants would also have the option to continue with a private placement. In reality, OTC would be the only option moving forward.

11. As the deadline to consent to the conversion grew closer, Plaintiffs became increasingly concerned with the changes being made to the Fund, as they had no interest in OTC trading and its inherent volatility. Defendants repeatedly assured Plaintiffs that private

placement and redemption would continue to be available to institutional investors (including Plaintiffs).

12.     Relying on Defendants' representations, Plaintiffs kept their investments in the Fund and consented to the conversion.

13.     Defendants' deceit did not end there. Defendants embarked on an aggressive campaign to convince shareholders, including Plaintiffs, to cash out shares so as to provide liquidity for the Fund in OTC market trading in 2020.  Defendants embarked on an equally aggressive campaign to get Plaintiffs and other investors to reinvest so that BITW could continue to collect fees, even when such transactions would result in a true and obvious loss to Plaintiffs net of taxes.

14.     Plaintiffs' investment represented a substantial chunk of the assets managed by the Fund. As such, Theodore, on behalf of Plaintiffs, was in regular contact with the Defendants, who repeatedly reached out to Theodore to discuss impending changes to the Fund, as well as options that would continue to be available to institutional investors.

15.     Despite repeated assurances from Defendants that private placement would continue to be available for investors who wished to do so, it was not.

16.     Defendants' materially misleading misrepresentations and/or omissions caused Plaintiffs to retain their investments in the Fund and consent to the conversion, sell their shares of BITW via OTC, and reinvest in a fund in which Defendants knew Plaintiffs refused to invest by fraudulently representing the nature and options of the fund.

17.     It bears mention that the Fund and BITW have been the subject of numerous negative articles in the financial press which make clear that Defendants have undertaken a scheme to manipulate investors including Plaintiffs and convert the Fund for their own benefit.

## THE PARTIES

18.    Plaintiff Vandelay Industries TM LLC ("TM LLC") is a Wyoming limited liability company with its principal office in Manhattan, New York. Theodore Mukamal ("Theodore") is TM LLC's Manager.

19.    Plaintiff Vandelay Industries KM LLC ("KM LLC") is a Wyoming limited liability company with its principal office in Manhattan, New York. Kathleen Mukamal ("Kathleen") is KM LLC's Manager.

20.    Plaintiff Vandelay Industries AM LLC ("AM LLC") is a Wyoming limited liability company with its principal office in Manhattan, New York. Andrew Mukamal ("Andrew") is AM LLC's Manager.

21.    Defendant Bitwise Hold 10 Private Index Fund, LLC (the "Fund") is a domestic limited liability company duly formed and existing under the laws of the State of Delaware, with its principal place of business at 400 Montgomery St Ste 600, San Francisco, California, 94111.

22.    Defendant Bitwise Asset Management, Inc. ("BAM") is a domestic corporation duly formed and existing under the laws of the State of Delaware, with its principal place of business at 400 Montgomery St Ste 600, San Francisco, California, 94111.

23.    Defendant Bitwise 10 Crypto Index Fund ("BITW") is a domestic statutory trust duly formed and existing under the laws of the State of Delaware, with 400 Montgomery St Ste 600, San Francisco, California, 94111.

24.    Defendant Bitwise Investment Advisors, LLC ("BIA"), is a domestic limited liability company duly formed and existing under the laws of the State of Delaware, with its principal place of business at 400 Montgomery St Ste 600, San Francisco, California, 94111, and a wholly owned subsidiary of BAM.

5

25.     Defendant Hunter Horsley ("Horsley") is an individual who resides in San Francisco County in the State of California. According to BAM's website, Horsley is its Chief Executive Officer and Board Director.

26.     Defendant Matt Hougan ("Hougan") is an individual who resides in Alameda County in the State of California. According to BAM's website, Hougan is its Chief Investment Officer.

27.     Defendant Teddy Fusaro ("Fusaro") is an individual who resides in Fairfield County in the State of Connecticut. According to BAM's website, Fusaro is its President and former Chief Operating Officer with his principal place of business at 19 W 44th St. Suite 715 New York, NY 10036.

28.     Defendant James Farrell ("Farrell") is an individual who resides in San Francisco County in the State of California. According to BAM's website, Farrell is its Head of Investor Relations.

## FACTS COMMON TO ALL CAUSES OF ACTION

29.     BAM was formed in 2017.

30.     BAM is led by co-founders Horsley and Hong Kim, BAM's Chief Technology Officer.

31.     The Fund was formed as a limited liability company under the Delaware Act with the name "Bitwise HOLD 10 Private Index Fund, LLC".

32.     Horsley executed the Limited Liability Agreement of the Fund, dated as of September 18, 2017 (the "Initial Agreement").

33.     On September 27, 2017, upon information and belief, to fix a typographical error, Horsley filed the Amended and Restated Certificate of Formation of the Fund with the Delaware

6

Secretary of State and executed Amendment No. 1 to the Initial Agreement (the "Amended Initial Agreement").

34.     The Amended Initial Agreement was subsequently amended and restated by the Amended and Restated Limited Liability Company Agreement, dated as of November 22, 2017 ("LLC Agreement").

35.     During the timeframe relevant to this dispute, the Fund was a passive fund that held the ten largest cryptocurrencies weighted by market capitalization, which weighting was rebalanced monthly.

36.     The Fund was managed by BIA, a wholly owned subsidiary of BAM.

37.     Between February and March 2018, Plaintiffs executed Subscription Agreements in connection with their investment in the Fund ("2018 Subscription Agreements").

38.     The 2018 Subscription Agreements incorporated the terms of a Confidential Private Placement Memorandum, dated November 2017 ("PPM", together with 2018 Subscription Agreements, the "Fund Documents"), pursuant to which Plaintiffs were offered shares in the Fund.

39.     The 2018 Subscription Agreements allowed investors weekly redemptions, in contrast to many other private investment funds, which often include long lock-up periods preventing or limiting redemptions.

40.     Theodore, through TM LLC, invested $350,000 into the Fund.

41.     Kathleen, through KM LLC, invested $700,000 into the Fund.

42.     Andrew, through AM LLC, invested $250,000 into the Fund.

43.     As an inducement to attract larger investors, "institutional investors" in the fund were offered a reduced management fee of 2% fee, which was substantially lower than the fee of

2.5% provided for in then Fund Documents. In fact, Theodore was so concerned that Defendants would greedily seek to increase their fees, that Theodore insisted on three signed side letters capping fees for the Fund at 2% which were signed by Horsley and Plaintiffs on February 18, 2018.

44.    Plaintiffs were qualified as "institutional investors" of the Fund.

45.    In deciding to invest in the fund, Plaintiffs relied upon the reduced management fee offered to institutional investors.

46.    The Fund Documents discussed that the Fund was a private placement, as opposed to an investment that would trade OTC.

47.    The Fund Documents made no mention of any intention to change the Fund's structure from a privately held investment to an OTC investment, which is traded through brokerage accounts and on public stock exchanges.

### The Fund's Conversion to BITW, a Statutory Trust

48.    On March 27, 2020, Horsley informed Plaintiffs via email of the Fund's intention to convert from a limited liability company to a statutory trust and make shares tradable through OTC markets.

49.    Defendants gave all investors of the Fund the option to either consent to the conversion or to redeem shares in the Fund at a loss.

50.    The deadline to consent to the conversion was April 24, 2020.

51.    Plaintiffs only had two choices; consent to the Fund's conversion, including the significant change of the Fund from a private placement to an OTC traded fund, or redeem their shares at a significant loss.

52.     It should be noted that at the time that Plaintiffs were given this choice, based upon the then-unfolding COVID pandemic and resulting shutdown, the cryptocurrency market was trading down significantly.

53.     Given the current state of the market – a historic crash caused by a historic pandemic - Plaintiffs' "choice" between converting or selling out at a fire sale price was not a real choice at all; Plaintiffs had no real choice but to consent to the conversion.

54.     With this backdrop, in March and early April of 2020, Defendants began soliciting the consent of investors', including Plaintiffs', to convert the Fund to a statutory trust.

55.     Plaintiffs were concerned with the implications of the conversion, as the nature of the Fund was materially changing.

56.     On March 31, 2020, upon Horsley's request, Theodore, Horsley, and Farrell discussed the impending changes to the Fund over the phone.

57.     At that time, Plaintiffs' collective $1.3 million investment represented a substantial portion – specifically, 2.6% – of the assets invested in BITW products.

58.     During that telephone call, Theodore expressed his deep concern and disinterest in holding OTC shares and explained that it was not what Plaintiffs signed up for in investing in the Fund or what was disclosed in the Fund Documents.

59.     In response, Horsley suggested that Plaintiffs sell their shares when the shares began trading OTC at an expected premium above the net asset value ("NAV"). Horsley stated that Plaintiffs would then be able to reinvest in a privately held/ non-OTC affiliated fund.

60.     Horsley and Farrell's representation that non-OTC options would continue to be available was repeatedly confirmed in subsequent communications, both between themselves and Plaintiffs and to all investors.

61.    In a document entitled, "Bitwise Monthly Investor Letter – April 2020", sent by Hougan via email on April 6, 2020, Defendants expressly assured investors, including Plaintiffs, that "**[i]nvestors who wish to invest through the private placement will continue to be able to do so**." This was intentionally misleading.

62.    Three days later, on April 9, 2020, Horsley informed Theodore via email of another material change being made to the Fund. Therein, Horsley stated that "after the conversion, the fund will consolidate to a single share class" and would be increasing its annual fee by 25%, from 2% to 2.5%.

63.    In a series of emails between Theodore and Farrell, Theodore expressed his concern about the increased fee and reiterated that Plaintiffs were only interested in keeping their investment in a non-OTC fund. In response, Farrell informed Theodore that going forward, all investors would be charged a 2.5% fee and assured him that they "will continue to offer subscriptions into the private placement."

64.    Relying on Defendants' representations and assurances, Plaintiffs chose to keep their investments in the Fund.

65.    The option to exit the Fund expired on April 24, 2020.

66.    On April 24, 2020, relying on Defendants' repeated representations and assurances that private placement would continue to be available, Plaintiffs consented to the conversion.

67.    Attached to the consent was a Confidential Disclosure Statement, dated April 2020, the Action by Written Consent of the Members, the Agreement and Plan of Conversion, and the Trust Agreement ("Conversion Documents").

68.    The Conversion Documents mentioned the closing of redemptions pending approval of trading on the market, but included a carve out for the continued private sale of shares to institutional investors.

69.    In fact, the very first paragraph on the first page of the "Summary of the Conversion" section of the Confidential Disclosure Statement assures investors that "[t]he Fund will continue to privately sell shares directly to institutional investors." This was in line with the information Defendants repeatedly gave to Plaintiff regarding the availability of private placement. Plaintiffs were institutional investors. Additionally, page 18 of the Conversion Documents included extensive language indicating that private redemptions would still be available to investors: "Subject to the restrictions described below, each investor in the Fund (each, an "Investor") may request a redemption (a "Withdrawal Request") of any Shares attributable to any subscription of Shares from the Fund, including any subscription from the Fund as it existed as a limited liability company (each, a "Subscription"), as of the first Weekly Withdrawal Time (as defined below) that occurs on or immediately following, the 12 month anniversary of the date on which that Subscription was made (such initial 12 month period, the "Lock-Up Period"); provided that, an Investor may, in its discretion, request redemption of all or a portion of Shares during a Lock-Up Period on a Withdrawal Date upon the payment of a 3% early withdrawal fee to the Fund and subject to all other redemption restrictions." The Conversion Documents similarly included the negligent and misleading language giving assurances of continued private redemptions on page. 133 and stated: "Subject to the limitations set forth in this Article 7 and elsewhere in this Agreement, and subject also to the notice requirement described below, at any time prior to the Redemption Cutoff Date, each Shareholder may request that the Trust redeem all or a portion of such Shareholder's Shares attributable to

11

any Contribution as of the first Redemption Date that occurs on or immediately following, the twelve month anniversary of the Subscription Date on which that Contribution was made (the "Lock-up Period")…"If a Shareholder gives written notice to the Administrator by the Weekly Redemption Cut Off (typically each Monday at 14:00 PT), the price per Share the Shareholder receives is determined at that week's Weekly Valuation. If a Shareholder gives written notice to the Administrator after the Weekly Redemption Cut Off, the price per Share will be determined as of the next succeeding Weekly Valuation."

70.    Thereafter, the Fund was converted from a limited liability company to a statutory trust, and the name of the Fund changed to BITW.

71.    BITW continued to be managed by BAM.

72.    Redemptions for BITW closed on or about October 7, 2020.

**Defendants' Aggressive Campaign to Coerce Plaintiffs to Sell in a "Pump and Dump" Scheme**

73.    After Defendants convinced Plaintiffs not to exit the Fund, now BITW, Defendants doubled down on their deceit. Not only did Defendants continue to mislead Plaintiffs into believing their investments would be privately placed, but they also self-servingly coerced Plaintiffs into selling their shares of BITW, which resulted in, among other financial consequences, severe tax consequences for Plaintiffs.

74.    As background, one of the primary negatives of the OTC market is the lack of trading volume, which results in a situation whereby investments traded on the OTC market are less liquid.

75.    On October 30, 2020, Farrell sent an email to investors encouraging investors to sell their shares via OTC to "help a liquid secondary market form." Farrell also encouraged

investors to reinvest in BITW after selling their shares, "[n]ot by buying in your brokerage account, but by investing again directly in BITW at NAV [net asset value], *as you have in the past* (via our site or the investor relations team)," which gave the misleading illusion that reinvested funds would enter and exit at NAV, as they had in the past. This was not true.

76.     Defendants' October 30, 2020, email attached a link to a document entitled "Additional Details on Planned Changes to the Bitwise 10 Private Index Fund." The document referenced a point in time in the future when direct redemptions would cease, which was contrary to the information conveyed in previous communications from Defendants, both by email and direct communications, regarding when redemptions closed and the ability to privately redeem.

77.     At that time, Plaintiffs became skeptical of misleading and contradicting information given by Defendants about BITW and considered redeeming their investments.

78.     On November 6, 2020, Farrell invited investors to a "shareholders-only webinar" to "cover what to expect and do when trading starts" and would specifically cover, among other things, "*[h]ow & why to consider selling and then reinvesting via private placement*."

79.     Horsley and Farrell also reached out to Theodore directly to convince Plaintiffs to sell their shares in BITW. Horsley requested to meet over Zoom "to make the case for moving [his] shares and putting a limit sell order in day 1."

80.     On November 11, 2020, Horsley, Farrell, Fusaro, and Theodore participated in a Zoom meeting. Horsley aggressively persuaded Theodore to sell Plaintiffs' shares via OTC because the fund needed shares to provide liquidity to new investors. Theodore expressed his frustration and concern about OTC volatility and stated that Plaintiffs wanted to remain long-term investors and remain in the fund and did not want to be involved in OTC trading and its

inherent volatility. Horsley assured Theodore that he could reinvest the same day and maintain

"market exposure." They discussed the logistics of wiring funds the same day to maintain market

exposure but to invest in the non-OTC fund.

81.     Theodore repeatedly made clear that Plaintiffs had no interest in being involved in

OTC and would only reinvest in a privately held and privately redeemable fund.

82.     Horsley repeatedly reassured Theodore that he could re-invest in the non-OTC

fund, which would be privately held and privately redeemable.

83.     Horsley then gave Theodore specific instructions on what Plaintiffs needed to do

to execute the investment strategy they discussed. Horsley specifically advised Theodore to put

one-day limit orders at 1.25 times the NAV and to sell all shares as soon as possible.

84.     Horsley misled Theodore by stating that BITW was still accepting private

placements and omitted that, even though Theodore's new investment would be privately placed,

he would only be able to sell via OTC, which Horsley knew Theodore did not want to do.

85.     Horsley also misled Plaintiffs by omitting the severe tax consequences they would

incur by following his instructions.  Indeed, during their many discussions, Horsley never even

advised Theodore that this strategy could even have tax ramification for Plaintiffs or that

Plaintiffs should consult with a tax expert. Horsley, with a B.S. in Economics from the Wharton

School of Finance, would have been well aware that selling, for example, $1M in shares at 1.25

times the NAV and reinvesting immediately but incurring taxes totaling 37.1% (20% IRS long

term capital gains, 13.3% New York City and State, 3.8% Medicare for high income) would

mean a net loss of $213,750. Nevertheless, Horsley and Bitwise used these aggressive and solely

self-serving tactics and advice during this campaign to achieve their goals of the "pump and

dump" scheme.

86.     The next day, Theodore participated in the "shareholders-only webinar," during which Defendants aggressively encouraged investors to place a "limit order" on day 1 and then reinvest with them. Defendants never mentioned during the webinar or in the emails to investors that, in doing so, they would not be able to redeem shares privately and would be subject to the volatility of the OTC markets.

87.     On December 8, 2020, Horsley, Fusaro, and Farrell sent an email assuring investors that "[s]ubscriptions at NAV through private placement will remain open indefinitely, _**alongside**_ public trading."

88.     In March 2021, relying on Defendants' representations and assurances that private placement would continue to be available, and that Plaintiffs would be able to reinvest privately, Plaintiffs sold all shares of BITW via OTC, which resulted in tax consequences of approximately $3.84 million owed by Plaintiffs.

89.     Defendants were aware of the substantial and likely risk that such an OTC Fund would trade well below the NAV in the long term due to the same discount that has routinely been applied in valuing the longer established Greyscale Bitcoin OTC Trust. Given that the BITW Fund has high fees of 2.5% and is taxed issuing individual K-1s, the market discounts the net present value of the fees over a long-term horizon and is not willing to pay the NAV for shares in the fund. Nevertheless, Defendants pursued this risky "pump and dump" scheme to create an initial "pop" in the OTC markets and then leave Fund investors consistently under water, as the Fund has consistently traded 35-40% below the NAV for three years.  Defendants were aware of the substantial and likely risk that such an OTC Fund would trade well below the NAV in the long term due to the same discount that has routinely been applied in valuing the longer established Greyscale Bitcoin OTC Trust. Given that the BITW Fund has high fees of

15

2.5% and is taxed issuing individual K-1s, the market discounts the net present value of the fees over a long-term horizon and is not willing to pay the NAV for shares in the fund. Nevertheless, Defendants pursued this risky "pump and dump" scheme to create an initial "pop" in the OTC markets and then leave Fund investors consistently under water, as the Fund has consistently traded 35-40% below the NAV for three years.

**Plaintiffs Invest in BITW in Reliance on Defendants' Misrepresentations**

90. Plaintiffs were in direct and personal contact with Horsley and Farrell in connection with Plaintiffs' reinvestment into BITW.

91. Relying on Defendants' representations and assurances that Plaintiffs would be privately placing funds that could be redeemed at NAV, on March 8 and March 17, 2021, Plaintiffs signed a total of six subscription agreements ("2021 Subscription Agreements"), thereby reinvesting $4.85 million into BITW. Even though Plaintiffs 2018 investments in the Fund yielded a net profit upon liquidation in 2021, that investment is resolved and is not being litigated. What is being litigated are the false and misleading statements both in the governing trust document, in emails, and most importantly in a 2020 phone call and a 2020 zoom meeting in which Defendants promised Plaintiffs that they would be able to immediately reinvest in a privately held fund (as they had in 2018), however the truth is that Defendants did not have this privately held fund available to reinvest in until approximately 6 months after they had aggressively and successfully persuaded Plaintiffs to reinvest. Defendants were so concerned with continuing to increase their AUM ("assets under management") and to generate fees from Plaintiffs that they disregarded Plaintiff's express desire to not be involved in OTC products.

92.     The 2021 Subscription Agreements were not clear on redemptions of privately placed shares, but Defendants repeatedly assured Plaintiffs that they would be able to redeem privately placed shares at NAV.

93.     Because of Defendants' delayed responses to Theodore's emails, as well as confusing instructions given by Defendants to Plaintiffs regarding the proper forms to fill out, Plaintiffs were forced to purchase fewer shares than they had sold in the weeks prior due to the cryptocurrency market moving higher before money could settle to wire out for reinvestment.

94.     As a result, despite being guaranteed that they would maintain market exposure at all times, by following Defendants' instructions, Plaintiffs missed a significant move up in cryptocurrencies, further harming Plaintiffs.

**Defendants' Deceit is Exposed**

95.     On September 9, 2021, Defendants announced via email the launch of two new funds, including "Bitwise 10 Crypto Index Fund (non-OTC Trust)" ("Bitwise non-OTC Fund").

96.     The announcement email explained that "this 'non-OTC' fund does not, and will not, have public trading of its shares. Instead, investors can subscribe and redeem at NAV on a weekly basis, with no lockup."

97.     Recognizing that the release of this new non-OTC fund would create confusion, as Defendants had misled investors, including Plaintiffs, into believing that a non-OTC option already existed, Defendants sent an email update to investors stating that "[a]n updated Private Placement Memorandum reflecting these changes will be available September 20th."

98.     Defendants, however, did not receive an updated Private Placement Memorandum until it was emailed by Farrell to Theodore on February 28, 2024. Only this new private

placement memorandum clearly states page 4 under "Redemptions: Currently, the Trust does not offer redemptions."

99. On February 26, 2024, Theodore emailed Wade Hampton, a private client manager of BAM, and asked when the withdrawal dates were and requested the paperwork required to withdraw.

100. Defendants did not respond to that email.

101. Two days later, on February 28, 2024, Theodore followed up on his email, this time sending it to Farrell, as well, and expressed the time sensitive nature of a prompt response, as the withdrawal window for that week had passed because of Defendants' failure to respond.

102. Contrary to each and every representation and assurance made by Defendants to Plaintiffs, Farrell informed Theodore for the first time that redemptions were only available via OTC, and that Plaintiffs would need to transfer them out of EQ (BAM's transfer agent) and into a brokerage account to sell their shares via OTC.

103. Between February and March 2024, Theodore, Horsley, and Farrell communicated regarding this issue. During these discussions, Farrell admitted that he had received similar complaints from numerous investors. As Farrell conceded, investors in the Fund / BITW were upset and frustrated with Defendants' management of the product and that the discount from the NAV when investors sold was typically in the range of 35-45%, and has been as much as 65% below NAV. Theodore and Horsley have lengthy zoom meetings on March 7 and March 26, 2024 to try and resolve the dispute amicably. Horsley showed no sympathy or understanding for having intentionally misled the Mukamal family in this investment. Horsley demonstrated zero value for the client relationship while and offers no apologies.

104.    Plaintiffs had presumed incorrectly that their 2021 investments are privately placed, privately held, and privately redeemable for 3 years. In an identical fashion to the 2018 investments, Plaintiffs continue to receive annual K-1 tax documents, monthly statements reflecting the NAV, and the shares are held on an account login to Bitwise directly (not via a brokerage account).

105.    Thus, despite all prior representations from Defendants, Plaintiffs invested in a product that (1) significantly underperformed, leading to massive financial losses; (2) became an OTC-traded fund, which only compounded the volatility and losses suffered by Plaintiffs; and (3) charged management fees far in excess of those to which Plaintiffs initially agreed.

106.    In fact, concerning the management fees, Seeking Alpha, a leading financial publication, published an article concerning BITW on February 21, 2024, which noted that the fees being charged by BITW were much higher than what was standardly charged. It stated that "The Fund's management fees are very high and its K-1 tax treatment is a material drawback to ownership." It also stated that "Non-Diversified: 90% of the Fund consists of Bitcoin and Ethereum. By virtue of this large-cap crypto focus, the Fund necessarily misses some of the massive returns that occur in the smaller-cap token space." The article also noted, "Discount/Premium: As a trust, the Fund does not necessarily trade at or near its net asset value ("NAV"). Currently, the Fund trades at a significant discount to its NAV. There is no guarantee that the NAV discount will shrink or that it will not grow even wider." And the article's author concluded in saying, "I am not particularly excited about the Fund given the more affordable options available. The K-1 partnership tax treatment is a material, if not fatal, drawback too (for me at least). If taxes are not an issue, I would SELL the Fund and gain exposure to the

19

underlying cryptocurrencies utilizing more reasonably priced (i.e., lower management fee) options."

107.     Between March 26, 2024 and April 4, 2024, Plaintiffs sold all of their shares of BITW via OTC at an average value of 35.40 per share.  During this time, the NAV – which is what Plaintiffs would have sold at had the fund not converted – was at an average value of 54.45 per share.

108.     Plaintiffs' 2021 investment of $4.85 million was reduced to $3,593,556.14.

109.     At that time that Plaintiff's sold, their investment would have been worth $5,528,433.83 at NAV (representing a whopping 35% difference off of the NAV).

110.     Plaintiffs have been damaged by $1,934,877.69 because of Defendants' false and materially misleading statements and omissions of material facts.

### AS AND FOR A FIRST CAUSE OF ACTION
**(Breach of Fiduciary Duty)**

111.     Plaintiffs repeat and reallege each of the foregoing paragraphs as though fully set forth herein.

112.     Defendants owed fiduciary obligations to Plaintiffs, including the duties of loyalty, good faith, candor and due care.

113.     The Individual Defendants are principals of BAM, the entity responsible for managing the Fund, now BITW.

114.     Defendants breached their fiduciary obligations by making repeated false and/or misleading statements and omissions to Plaintiffs regarding the nature and liquidity of the Fund and BITW's investments. These false and/or misleading statements and omissions were made to Plaintiffs in response to Plaintiffs' specific inquiries for the purpose of keeping Plaintiffs'

investments in the Fund and BITW by concealing the truth in violation of Defendants' fiduciary duties.

115.    Moreover, Defendants caused the Fund and BITW to be managed in a manner that was inconsistent with their fiduciary duties towards Plaintiffs as investors in the Fund and BITW.

116.    Acting in their own self-interest and in knowing violation of, or reckless and bad faith disregard of, the law, Defendants knowingly increased their own fees and converted the nature of the Fund from a private placement to an OTC-traded vehicle.

117.    These changes enriched Defendants at the expense of Plaintiffs.

118.    Defendants further owed a fiduciary duty to Plaintiffs to supervise the issuance and content of the Fund and BITW's documents and statements made on the Fund and BITW's behalf to ensure that such documents and statements were truthful and accurate and that such statements and documents conformed to applicable securities laws. Defendants, however, breached their fiduciary duties by allowing the Fund and BITW to issue and disseminate statements that were materially false and/or misleading and failed to disclose material information concerning the Fund and BITW.

119.    Plaintiffs were injured by Defendants' breaches of fiduciary duty, insofar as the misstatements and omissions perpetrated by Defendants caused Plaintiffs to keep their investments in the Fund and BITW and contributed directly to the injury that Plaintiffs suffered.

120.    As a direct and proximate result of Defendants' breaches of their fiduciary duties, Plaintiffs have suffered damages in an amount to be determined at trial.

121.    The Individual Defendants' conduct was willful, wanton, and malicious, and warrants the imposition of punitive damages.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Negligence)

122.    Plaintiffs repeat and reallege each of the foregoing paragraphs as though fully set forth herein.

123.    In addition to the duties set forth above, Defendants owed Plaintiffs a duty to exercise reasonable care, competence, and diligence in the management of the Fund and BITW, and to act in a manner consistent with industry customs, practice, and standards.

124.    Defendants breached their duties owed to Plaintiffs by soliciting investments in a type of fund that Plaintiffs clearly and unambiguously stated they did not want to invest in, by making material misrepresentations and/or omissions to Plaintiffs regarding the availability of private investments and redemptions in that fund, and failing to comply with industry customs, practice, and standards in connection therewith, including but not limited to failing to comply with all applicable federal and state securities laws, rules, and regulations as to the suitability of these investments.

125.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages in an amount to be determined at trial, including but not limited to millions of dollars lost on their investments and unexpected tax consequences.

126.    The Individual Defendants' conduct was willful, wanton, and malicious, and warrants the imposition of punitive damages.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Negligent Misrepresentation)

127.    Plaintiffs repeat and reallege each of the foregoing paragraphs as though fully set forth herein.

128.    Defendants owed duties of care and loyalty to Plaintiffs because Plaintiffs had entrusted their capital to them, and reposed trust and confidence in them. Defendants accepted Plaintiffs' trust and confidence, forming a fiduciary relationship.

129.    In connection with Plaintiffs' consideration of BITW, Defendants provided false and/or misleading information, or caused such false and/or misleading information to be provided, both before Plaintiffs purchased shares in BITW and later, once Plaintiffs became shareholders, for the purpose of keeping Plaintiffs as shareholders in BITW.

130.    Defendants intended Plaintiffs to rely upon the false and/or misleading information in deciding whether to invest, or remain in, BITW.

131.    Defendants failed to exercise reasonable care or competence in obtaining or communicating the information supplied to Plaintiffs. Defendants acted negligently and carelessly.

132.    Plaintiffs justifiably relied upon the information supplied by Defendants in deciding to make and retain their investments in BITW, and suffered harm as a result. Plaintiffs could not have known that the Defendants' representations were false, as Defendants concealed the truth during Plaintiffs' due diligence and thereafter.

133.    If Plaintiffs had known the truth, they would not have made their investments in BITW, would not have continued to invest in BITW, and would have redeemed their investments.

134.    As a direct and proximate result of Defendants' conduct, Plaintiffs have sustained damages in an amount to be proven at trial.

23

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Fraud)

135.    Plaintiffs repeat and reallege each of the foregoing paragraphs as though fully set forth herein.

136.    Defendants knowingly, or recklessly, made false and/or misleading material statements and omissions to Plaintiffs prior to Plaintiffs' investments in BITW, for the purpose of inducing Plaintiffs to invest in BITW.

137.    In connection with their fraudulent scheme, Defendants continued to disseminate false and/or misleading statements and omissions to Plaintiffs after Plaintiffs made their investments for the purpose of concealing the truth to induce Plaintiffs, in reliance on the false statements and omissions, to retain their investment interests in BITW.

138.    Defendants had a duty to disclose material information, such as the magnitude and liquidity of Plaintiffs' investments, because Defendants owe Plaintiffs duties of care and loyalty with respect to the management of capital Plaintiffs entrusted to them.

139.    Defendants also had a duty to not tell half-truths and to supply full information so that statements made by Defendants would not be misleading.

140.    Defendants also had a duty to disclose material omissions because they had superior and peculiar knowledge not available to Plaintiffs.

141.    Defendants intended to defraud Plaintiffs. As stated above, Defendants made false and/or misleading representations and omissions with actual knowledge of their falsity and/or reckless disregard for the truth at the time they were made.

142.    Plaintiffs reasonably and justifiably relied on these misstatements and/or omissions in deciding to invest in BITW, and in maintaining their investments.

143.    Plaintiffs actively sought clarification from Defendants concerning material aspects of the Fund and BITW, including whether a private placement option would continue to be available. Plaintiffs could not have known that Defendants' representations were false, as Defendants concealed the truth during Plaintiffs' due diligence and thereafter. The documents that Defendants provided to Plaintiffs were confusing and misleading, and Defendants seemed to plausibly explain and clarify that Plaintiffs investment would be privately placed and privately redeemable. Plaintiffs discovered the truth only after Defendants began marketing the non-OTC fund that Defendants had misled Plaintiffs into believing already existed and invested in.

144.    If Plaintiffs had known the truth, they would have redeemed their investments before the conversion of the Fund to BITW, they would not have made their investments in BITW, and would not have continued to invest in BITW.

145.    By virtue of the foregoing, Defendants have committed fraud.

146.    The fraudulent conduct of Defendants, as outline above, was committed purposefully, knowingly, recklessly, and without regard for the rights and interests of Plaintiffs.

147.    As a direct and proximate result of Defendants' material misrepresentations and omissions, Plaintiffs have found their capital invested in far riskier and less liquid investments than they otherwise would have chosen and have been denied the ability to redeem their investments as represented. These factors resulted in significant financial losses to Plaintiffs.

148.    Plaintiffs are therefore entitled to damages in an amount to be determined at trial.

<u>**AS AND FOR A FIFTH CAUSE OF ACTION**</u>
**(Conspiracy to Commit Fraud)**

149.    Plaintiffs repeat and reallege each of the foregoing paragraphs as though fully set forth herein.

Case 1:24-cv-07554    Document 1-1    Filed 10/04/24    Page 29 of 75

150.    As alleged above, Defendants committed acts of fraud by knowingly or recklessly making false and/or misleading statements and omissions to Plaintiffs in connection with Plaintiffs' investments in BITW.

151.    Defendants agreed and conspired together to commit fraud and engage in a course of material misrepresentations and omissions to conceal the fraudulent acts.

152.    Defendants intentionally and knowingly committed overt acts in furtherance of this conspiracy, including by making the misrepresentations detailed above.

153.    As a direct and proximate result of Defendants' conduct, Plaintiffs have sustained damages in an amount to be proven at trial.

**AS AND FOR A SIXTH CAUSE OF ACTION**
**(Violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder)**

154.    Plaintiffs repeat and reallege each of the foregoing paragraphs as though fully set forth herein.

155.    Defendants knowingly, or recklessly, made false and/or misleading material statements and omissions of material fact to Plaintiffs for the purpose of inducing Plaintiffs to sell their shares of BITW and reinvest in BITW.

156.    Defendants' material misrepresentations included, *inter alia*, stating that private placement and redemptions would continue to be available as an option alongside public trading.

157.    These representations were false at the time they were made.

158.    Defendants' material omissions included, *inter alia*, failing to disclose that they knew private placement would not be available for Plaintiffs to reinvest.

159.    Each of the foregoing misrepresentations and omissions were material and would have been important to the investment decisions of a reasonable investor.

26

160.    Defendants had a duty to disclose material information because they owed Plaintiffs a fiduciary duty and received fees for the management of BITW.

161.    Defendants made these false and/or misleading representations and omissions to Plaintiffs with actual knowledge of their falsity and/or reckless disregard for the truth at the time they were made.

162.    Defendants, as seasoned investment professionals, were well aware of the substantial commissions and fees they stood to earn upon the sale and reinvestment of Plaintiffs' shares in BITW, and that Plaintiffs did not want to be involved in an OTC-traded investment, but pressured Plaintiffs into selling and reinvesting regardless.

163.    Plaintiffs had no way of knowing this information absent full and fair disclosure by Defendants.

164.    Defendants made these material misrepresentations or omitted to disclose material facts with the intention of inducing Plaintiffs, in reliance therein, to sell their shares in BITW and to reinvest in BITW.

165.    Plaintiffs reasonably and justifiably relied on these misstatements and omissions in deciding to sell their shares in BITW and to reinvest in BITW.

166.    By virtue of the foregoing, Defendants violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder in that they, directly or indirectly, by use of the means or instrumentalities of interstate commerce and/or the mails, or of a facility of a national securities exchange, knowingly or reckless employed devices, schemes and artifices to defraud, made untrue statements of material facts or omitted to state facts that they were under a duty to speak, and engaged in acts of fraud and deceit upon Plaintiffs, all in connection with the purchase or sale of securities, i.e., the shares of BITW.

167.    Plaintiffs were harmed by the wrongful, predatory and illegal conduct of the Individual Defendants.

168.    As a direct and proximate result of Defendants' material misrepresentations and omissions, Plaintiffs were forced to incur substantial losses in the sale of their shares in 2024.

169.    Plaintiffs are therefore entitled to damages in an amount to be determined at trial.

170.    Defendants conduct was willful, wanton, and malicious, and warrants the imposition of punitive damages.

**WHEREFORE**, Plaintiffs demands judgment against Defendants:

(a)    on the first cause of action, for damages against Defendants in an amount to be determined at trial;

(b)    on the second cause of action, for damages against Defendant in an amount to be determined at trial;

(c)    on the third cause of action, for damages against Defendants in an amount to be determined at trial;

(d)    on the fourth cause of action, for damages against Defendants in an amount to be determined at trial;

(e)    on the fifth cause of action, for damages against Defendants in an amount to be determined at trial; and

(f)    on the sixth cause of action, for damages against Defendants in an amount to be determined at trial;

(g)     on all causes of action, for an award of the costs, disbursements, legal fees, and other expenses incurred by Plaintiffs, together with such other and further relief as the Court deems just and proper.

Dated:  Uniondale, New York
        June 21, 2024

                      WESTERMAN BALL EDERER
                      MILLER ZUCKER & SHARFSTEIN, LLP

                      By: _____
                            Andrew S. Lewner, Esq.
                      1201 RXR Plaza
                      Uniondale, New York 11556
                      (516) 622-9200
                      *Attorneys for Plaintiffs*

03018263

## VERIFICATION

Illinois L2

STATE OF ~~NEW YORK~~ )

Cook L2 ) ss.:

COUNTY OF ~~NEW YORK~~ )

**Theodore Mukamal**, being duly sworn, deposes and says:

1.      I am the Manager of plaintiff Vandelay Industries TM LLC, a Wyoming limited liability company.

2.      I have read the within Complaint and know the contents thereof; and same is true to my knowledge, except as to the matters therein stated to be alleged upon information and belief, and as to those matters, I believe them to be true.

3.      This Verification is made by deponent because Plaintiff is a limited liability company and I am the Manager thereof.

**THEODORE MUKAMAL**

Sworn to before me this

21 day of June, 2024

Notary Public

Official Seal
LILIYA ZELDIN
Notary Public, State of Illinois
Commission No. 986917
My Commission Expires February 8, 2028

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
--------------------------------------------------------------------X
VANDELAY INDUSTRIES TM LLC,
VANDELAY INDUSTRIES KM LLC,                          Index No.: 653436/2024
VANDELAY INDUSTRIES AM LLC,
                                                     Date Purchased: July 8, 2024
                              Plaintiffs,
                                                     **AMENDED SUMMONS**
                  -against-

BITWISE HOLD 10 PRIVATE INDEX FUND, LLC,             Venue is based on CPLR 503(a).
BITWISE 10 CRYPTO INDEX FUND f/k/a BITWISE           Plaintiffs designate New York
HOLD 10 PRIVATE INDEX FUND, LLC, BITWISE             County as the place of trial.
ASSET MANAGEMENT, INC., BITWISE 10 CRYPTO
INDEX FUND, BITWISE INVESTMENT ADVISORS,
LLC, HUNTER HORSLEY, MATT HOUGAN, TEDDY
FUSARO, and JAMES FARRELL,

                              Defendants.
--------------------------------------------------------------------X
**TO THE ABOVE-NAMED DEFENDANTS:**

    **You are hereby summoned** to answer the amended complaint in this action, and to serve a

copy of your answer, or, if the amended complaint is not served with this amended summons, to

serve a notice of appearance on plaintiff's attorneys within twenty (20) days after the service of this

amended summons, exclusive of the day of service, where service is made upon you personally

within the state or within thirty (30) days after completion of service where service is made in any

other manner.  In case of your failure to appear or answer, judgment will be taken against you by

default for the relief demanded in the amended complaint.

Case 1:24-cv-07554    Document 1-1    Filed 10/04/24    Page 36 of 75

Dated: Uniondale, New York
August 9, 2024

WESTERMAN BALL EDERER
MILLER ZUCKER & SHARFSTEIN, LLP

By: *Andrew S. Lewner*
    Andrew S. Lewner, Esq.
1201 RXR Plaza
Uniondale, New York 11556
(516) 622-9200
alewner@westermanllp.com
*Attorneys for Plaintiffs*

To:    BITWISE 10 CRYPTO INDEX FUND f/k/a BITWISE
       HOLD 10 PRIVATE INDEX FUND, LLC,
       250  Montgomery St Ste 200
       San Francisco, California, 94111

       BITWISE ASSET MANAGEMENT, INC.
       250  Montgomery St Ste 200
       San Francisco, California, 94111

       BITWISE 10 CRYPTO INDEX FUND
       250  Montgomery St Ste 200
       San Francisco, California, 94111

       BITWISE INVESTMENT ADVISORS, LLC,
       250  Montgomery St Ste 200
       San Francisco, California, 94111

       HUNTER HORSLEY
       c/o BITWISE INVESTMENT ADVISORS, LLC,
       250  Montgomery St Ste 200
       San Francisco, California, 94111

       MATT HOUGAN
       c/o BITWISE INVESTMENT ADVISORS, LLC,
       250  Montgomery St Ste 200
       San Francisco, California, 94111

       TEDDY FUSARO
       c/o BITWISE ASSETT MANAGEMENT, INC.
       19 W 44th Street, Suite 715
       New York, NY 10036

       JAMES FARRELL
       c/o BITWISE INVESTMENT ADVISORS, LLC,

250 Montgomery St Ste 200
San Francisco, California, 94111

03070242

3

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------X

VANDELAY INDUSTRIES TM LLC,                 Index No.: 653436/2024
VANDELAY INDUSTRIES KM LLC,
VANDELAY INDUSTRIES AM LLC,

                          Plaintiffs,           **VERIFIED AMENDED**
                                                **COMPLAINT**

              -against-

BITWISE HOLD 10 PRIVATE INDEX FUND, LLC,
BITWISE 10 CRYPTO INDEX FUND f/k/a BITWISE
HOLD 10 PRIVATE INDEX FUND, LLC, BITWISE
ASSET MANAGEMENT, INC., BITWISE 10 CRYPTO
INDEX FUND, BITWISE INVESTMENT ADVISORS,
LLC, HUNTER HORSLEY, MATT HOUGAN, TEDDY
FUSARO, and JAMES FARRELL,

                          Defendants.

-------------------------------------------------------------------X

              Plaintiffs Vandelay Industries TM LLC, Vandelay Industries KM LLC and Vandelay

Industries AM LLC (together "Vandelay Industries" or "Plaintiffs"), by and through their

attorneys, Westerman Ball Ederer Miller Zucker & Sharfstein, LLP, as and for their Verified

Complaint against Bitwise 10 Crypto Index Fund, formerly known as Bitwise HOLD 10 Private

Index Fund, LLC (the "Fund"), Bitwise Asset Management, Inc. ("BAM"), Bitwise 10 Crypto

Index Fund ("BITW"), and Bitwise Investment Advisors, LLC ("BIA") (collectively, the

"Corporate Defendants"), Hunter Horsley ("Horsley"), Matt Hougan ("Hougan"), Teddy Fusaro

("Fusaro"), and James Farrell ("Farrell") (collectively, the "Individual Defendants") (Corporate

Defendants and Individual Defendants collectively, "Defendants"), allege as follows:

## NATURE OF THE CASE

1.    This action arises out of the egregious, self-serving and wrongful actions of Defendants to prey on investors such as Plaintiffs,[1] the Mukamal family.  The Mukamal family consists of Kathleen, a retired nurse and homemaker, and her two sons, Theodore and Andrew. Theodore is an attorney, and Andrew is a fashion stylist.

2.    Between February and March 2018, Plaintiffs entered into a series of subscription agreements, pursuant to which Plaintiffs invested approximately $1,300,000 into the Fund.

3.    The Fund was formed one year earlier, in 2017, and was managed by BIA, a wholly owned subsidiary of BAM, a brand-new company formed in the same year and primarily led by co-founders, defendant Hunter Horsley, then 27 years old, and defendant Hong Kim, then 25 years old. Horsley and Kim had scant work experience and little to no management experience, but were backed by well-funded investors. In 2021, BAM was valued at $500 million with an investment of $70 million in 2021. It is backed by billionaire financiers such as Daniel Loeb's Third Point LLC, Daniel Och's Willoughby Capital and the hedge fund billionaire Stanley Druckenmiller along with private equity corporate titan Henry Kravis. The firm now manages approximately $3 billion dollars in assets.

4.    The Fund was described as an expertly-managed cryptocurrency index fund that allowed investors to invest in cryptocurrencies while achieving diversification.

5.    Because the fund was touted as having been "actively managed" by expert investors, investors in the Fund, including Plaintiffs, were charged a significant management fee (which, as discussed below, Defendants improperly coerced Plaintiffs to allow Defendants to increase by a whopping 25%).

---

[1]  Plaintiffs are three single member entities, each run by a member of the Mukamal family.

6.     Two years after Plaintiffs invested in the Fund, in 2020, Defendants, through BAM, announced their intention to convert the Fund from a limited liability company to a statutory trust, and sought the consent of its investors, including Plaintiffs, to do so.  At that time, Defendants also announced other material changes to the Fund, including the nature of the investment changing from privately held to over the counter (known in the investment community as "OTC"), as well as a substantial increase in the management fee charged to investors. At the time of Plaintiff's investment, Defendants offered a reduced management fee for institutional investors, including Plaintiffs, of 2%, but as part of the conversion, Defendants substantially increased the management fee that they were charging investors by 25%!

7.     The conversion from a fund that traded on the OTC market represented a material change in the fund, as OTC markets are generally considered to trade in a far more volatile manner due to their lower volumes.

8.     Until that point, the Fund had never disclosed its intention to trade via OTC; indeed, Plaintiffs chose to invest in the Fund based specifically upon the representation that their investment would be privately placed and privately redeemable.

9.     The Individual Defendants, through and as principals of the Corporate Defendants, represented that the conversion of the Fund was in their investors' best interest. In reality, the unfortunate truth is that Defendants acted in their own self-interest to the detriment of their investors, including Plaintiffs.

10.     Defendants coerced investors, including Plaintiffs, to consent to the conversion through material misrepresentations and omissions. They led Plaintiffs, among others, to believe that in addition to trading OTC, Fund participants would also have the option to continue with a private placement. In reality, OTC would be the only option moving forward.

11.    As the deadline to consent to the conversion grew closer, Plaintiffs became increasingly concerned with the changes being made to the Fund, as they had no interest in OTC trading and its inherent volatility.    Defendants repeatedly assured Plaintiffs that private placement and redemption would continue to be available to institutional investors (including Plaintiffs).

12.    Relying on Defendants' representations, Plaintiffs kept their investments in the Fund and consented to the conversion.

13.    Defendants' deceit did not end there. Defendants embarked on an aggressive campaign to convince shareholders, including Plaintiffs, to cash out shares so as to provide liquidity for the Fund in OTC market trading in 2020.    Defendants embarked on an equally aggressive campaign to get Plaintiffs and other investors to reinvest so that BITW could continue to collect fees, even when such transactions would result in a true and obvious loss to Plaintiffs net of taxes.

14.    Plaintiffs' investment represented a substantial chunk of the assets managed by the Fund. As such, Theodore, on behalf of Plaintiffs, was in regular contact with the Defendants, who repeatedly reached out to Theodore to discuss impending changes to the Fund, as well as options that would continue to be available to institutional investors.

15.    Despite repeated assurances from Defendants that private placement would continue to be available for investors who wished to do so, it was not.

16.    Defendants' materially misleading misrepresentations and/or omissions caused Plaintiffs to retain their investments in the Fund and consent to the conversion, sell their shares of BITW via OTC, and reinvest in a fund in which Defendants knew Plaintiffs refused to invest by fraudulently representing the nature and options of the fund.

17.     It bears mention that the Fund and BITW have been the subject of numerous negative articles in the financial press which make clear that Defendants have undertaken a scheme to manipulate investors including Plaintiffs and convert the Fund for their own benefit.

## THE PARTIES

18.     Plaintiff Vandelay Industries TM LLC ("TM LLC") is a Wyoming limited liability company with its principal office in Manhattan, New York. Theodore Mukamal ("Theodore") is TM LLC's Manager.

19.     Plaintiff Vandelay Industries KM LLC ("KM LLC") is a Wyoming limited liability company with its principal office in Manhattan, New York. Kathleen Mukamal ("Kathleen") is KM LLC's Manager.

20.     Plaintiff Vandelay Industries AM LLC ("AM LLC") is a Wyoming limited liability company with its principal office in Manhattan, New York. Andrew Mukamal ("Andrew") is AM LLC's Manager.

21.     Upon information and belief, Defendant Bitwise 10 Crypto Hold Fund, f/k/a Bitwise Hold 10 Private Index Fund, LLC (the "Fund") is a domestic limited liability company duly formed and existing under the laws of the State of Delaware, with its principal place of business at 250 Montgomery St Ste 200, San Francisco, California, 94111.

22.     Upon information and belief, Defendant Bitwise Asset Management, Inc. ("BAM") is a domestic corporation duly formed and existing under the laws of the State of Delaware, with its principal place of business at 250 Montgomery St Ste 200, San Francisco, California, 94111.

23. Upon information and belief, Defendant Bitwise 10 Crypto Index Fund ("BITW") is a domestic statutory trust duly formed and existing under the laws of the State of Delaware, with 250 Montgomery St Ste 200, San Francisco, California, 94111.

24. Upon information and belief, Defendant Bitwise Investment Advisors, LLC ("BIA"), is a domestic limited liability company duly formed and existing under the laws of the State of Delaware, with its principal place of business at 250 Montgomery St Ste 200, San Francisco, California, 94111, and a wholly owned subsidiary of BAM.

25. Upon information and belief, Defendant Hunter Horsley ("Horsley") is an individual who resides in San Francisco County in the State of California. According to BAM's website, Horsley is its Chief Executive Officer and Board Director and his principal place of business at 250 Montgomery St Ste 200, San Francisco, California, 94111.

26. Upon information and belief, Defendant Matt Hougan ("Hougan") is an individual who resides in Alameda County in the State of California. According to BAM's website, Hougan is its Chief Investment Officer, and his principal place of business at 250 Montgomery St Ste 200, San Francisco, California, 94111.

27. Upon information and belief, Defendant Teddy Fusaro ("Fusaro") is an individual who resides in Fairfield County in the State of Connecticut. According to BAM's website, Fusaro is its President and former Chief Operating Officer with his principal place of business at 19 W 44th St. Suite 715 New York, NY 10036.

28. Upon information and belief, Defendant James Farrell ("Farrell") is an individual who resides in San Francisco County in the State of California. According to BAM's website, Farrell is its Head of Investor Relations and his principal place of business at 250 Montgomery St Ste 200, San Francisco, California, 94111.

## FACTS COMMON TO ALL CAUSES OF ACTION

29.     BAM was formed in 2017.

30.     Upon information and belief, BAM is led by co-founders Horsley and Hong Kim, BAM's Chief Technology Officer.

31.     The Fund was formed as a limited liability company under the Delaware Act with the name "Bitwise HOLD 10 Private Index Fund, LLC".

32.     Horsley executed the Limited Liability Agreement of the Fund, dated as of September 18, 2017 (the "Initial Agreement").

33.     On September 27, 2017, upon information and belief, to fix a typographical error, Horsley filed the Amended and Restated Certificate of Formation of the Fund with the Delaware Secretary of State and executed Amendment No. 1 to the Initial Agreement (the "Amended Initial Agreement").

34.     The Amended Initial Agreement was subsequently amended and restated by the Amended and Restated Limited Liability Company Agreement, dated as of November 22, 2017 ("LLC Agreement").

35.     During the timeframe relevant to this dispute, the Fund was a passive fund that held the ten largest cryptocurrencies weighted by market capitalization, which weighting was rebalanced monthly.

36.     The Fund was managed by BIA, a wholly owned subsidiary of BAM.

37.     Between February and March 2018, Plaintiffs executed Subscription Agreements in connection with their investment in the Fund ("2018 Subscription Agreements").

38.     The 2018 Subscription Agreements incorporated the terms of a Confidential Private Placement Memorandum, dated November 2017 ("PPM", together with 2018

7

Subscription Agreements, the "Fund Documents"), pursuant to which Plaintiffs were offered shares in the Fund.

39.    The 2018 Subscription Agreements allowed investors weekly redemptions, in contrast to many other private investment funds, which often include long lock-up periods preventing or limiting redemptions.

40.    Theodore, through TM LLC, invested $350,000 into the Fund.

41.    Kathleen, through KM LLC, invested $700,000 into the Fund.

42.    Andrew, through AM LLC, invested $250,000 into the Fund.

43.    As an inducement to attract larger investors, "institutional investors" in the fund were offered a reduced management fee of 2% fee, which was substantially lower than the fee of 2.5% provided for in then Fund Documents. In fact, Theodore was so concerned that Defendants would greedily seek to increase their fees, that Theodore insisted on three signed side letters capping fees for the Fund at 2% which were signed by Horsley and Plaintiffs on February 18, 2018.

44.    Plaintiffs were qualified as "institutional investors" of the Fund.

45.    In deciding to invest in the fund, Plaintiffs relied upon the reduced management fee offered to institutional investors.

46.    The Fund Documents discussed that the Fund was a private placement, as opposed to an investment that would trade OTC.

47.    The Fund Documents made no mention of any intention to change the Fund's structure from a privately held investment to an OTC investment, which is traded through brokerage accounts and on public stock exchanges.

Case 1:24-cv-07554    Document 1-1    Filed 10/04/24    Page 46 of 75

## The Fund's Conversion to BITW, a Statutory Trust

48.     On March 27, 2020, Horsley informed Plaintiffs via email of the Fund's intention to convert from a limited liability company to a statutory trust and make shares tradable through OTC markets.

49.     Defendants gave all investors of the Fund the option to either consent to the conversion or to redeem shares in the Fund at a loss.

50.     The deadline to consent to the conversion was April 24, 2020.

51.     Plaintiffs only had two choices; consent to the Fund's conversion, including the significant change of the Fund from a private placement to an OTC traded fund, or redeem their shares at a significant loss.

52.     It should be noted that at the time that Plaintiffs were given this choice, based upon the then-unfolding COVID pandemic and resulting shutdown, the cryptocurrency market was trading down significantly.

53.     Given the current state of the market – a historic crash caused by a historic pandemic - Plaintiffs' "choice" between converting or selling out at a fire sale price was not a real choice at all; Plaintiffs had no real choice but to consent to the conversion.

54.     With this backdrop, in March and early April of 2020, Defendants began soliciting the consent of investors', including Plaintiffs', to convert the Fund to a statutory trust.

55.     Plaintiffs were concerned with the implications of the conversion, as the nature of the Fund was materially changing.

56.     On March 31, 2020, upon Horsley's request, Theodore, Horsley, and Farrell discussed the impending changes to the Fund over the phone.

9

57.     At that time, Plaintiffs' collective $1.3 million investment represented a substantial portion – specifically, 2.6% – of the assets invested in BITW products.

58.     During that telephone call, Theodore expressed his deep concern and disinterest in holding OTC shares and explained that it was not what Plaintiffs signed up for in investing in the Fund or what was disclosed in the Fund Documents.

59.     In response, Horsley suggested that Plaintiffs sell their shares when the shares began trading OTC at an expected premium above the net asset value ("NAV"). Horsley stated that Plaintiffs would then be able to reinvest in a privately held/ non-OTC affiliated fund.

60.     Horsley and Farrell's representation that non-OTC options would continue to be available was repeatedly confirmed in subsequent communications, both between themselves and Plaintiffs and to all investors.

61.     In a document entitled, "Bitwise Monthly Investor Letter – April 2020", sent by Hougan via email on April 6, 2020, Defendants expressly assured investors, including Plaintiffs, that "**[i]nvestors who wish to invest through the private placement will continue to be able to do so.**" This was intentionally misleading.

62.     Three days later, on April 9, 2020, Horsley informed Theodore via email of another material change being made to the Fund. Therein, Horsley stated that "after the conversion, the fund will consolidate to a single share class" and would be increasing its annual fee by 25%, from 2% to 2.5%.

63.     In a series of emails between Theodore and Farrell, Theodore expressed his concern about the increased fee and reiterated that Plaintiffs were only interested in keeping their investment in a non-OTC fund. In response, Farrell informed Theodore that going forward, all

investors would be charged a 2.5% fee and assured him that they "will continue to offer subscriptions into the private placement."

64.     Relying on Defendants' representations and assurances, Plaintiffs chose to keep their investments in the Fund.

65.     The option to exit the Fund expired on April 24, 2020.

66.     On April 24, 2020, relying on Defendants' repeated representations and assurances that private placement would continue to be available, Plaintiffs consented to the conversion.

67.     Attached to the consent was a Confidential Disclosure Statement, dated April 2020, the Action by Written Consent of the Members, the Agreement and Plan of Conversion, and the Trust Agreement ("Conversion Documents").

68.     The Conversion Documents mentioned the closing of redemptions pending approval of trading on the market, but included a carve out for the continued private sale of shares to institutional investors.

69.     In fact, the very first paragraph on the first page of the "Summary of the Conversion" section of the Confidential Disclosure Statement assures investors that "[t]he Fund will continue to privately sell shares directly to institutional investors." This was in line with the information Defendants repeatedly gave to Plaintiff regarding the availability of private placement. Plaintiffs were institutional investors. Additionally, page 18 of the Conversion Documents included extensive language indicating that private redemptions would still be available to investors: "Subject to the restrictions described below, each investor in the Fund (each, an "Investor") may request a redemption (a "Withdrawal Request") of any Shares attributable to any subscription of Shares from the Fund, including any subscription from the

Case 1:24-cv-07554    Document 1-1    Filed 10/04/24    Page 49 of 75

Fund as it existed as a limited liability company (each, a "Subscription"), as of the first Weekly Withdrawal Time (as defined below) that occurs on or immediately following, the 12 month anniversary of the date on which that Subscription was made (such initial 12 month period, the "Lock-Up Period"); provided that, an Investor may, in its discretion, request redemption of all or a portion of Shares during a Lock-Up Period on a Withdrawal Date upon the payment of a 3% early withdrawal fee to the Fund and subject to all other redemption restrictions." The Conversion Documents similarly included the negligent and misleading language giving assurances of continued private redemptions on page. 133 and stated: "Subject to the limitations set forth in this Article 7 and elsewhere in this Agreement, and subject also to the notice requirement described below, at any time prior to the Redemption Cutoff Date, each Shareholder may request that the Trust redeem all or a portion of such Shareholder's Shares attributable to any Contribution as of the first Redemption Date that occurs on or immediately following, the twelve month anniversary of the Subscription Date on which that Contribution was made (the "Lock-up Period")…"If a Shareholder gives written notice to the Administrator by the Weekly Redemption Cut Off (typically each Monday at 14:00 PT), the price per Share the Shareholder receives is determined at that week's Weekly Valuation. If a Shareholder gives written notice to the Administrator after the Weekly Redemption Cut Off, the price per Share will be determined as of the next succeeding Weekly Valuation."

70.     Thereafter, the Fund was converted from a limited liability company to a statutory trust, and the name of the Fund changed to BITW.

71.     BITW continued to be managed by BAM.

72.     Redemptions for BITW closed on or about October 7, 2020.

**Defendants' Aggressive Campaign to Coerce Plaintiffs to Sell in a "Pump and Dump" Scheme**

73.     After Defendants convinced Plaintiffs not to exit the Fund, now BITW, Defendants doubled down on their deceit. Not only did Defendants continue to mislead Plaintiffs into believing their investments would be privately placed, but they also self-servingly coerced Plaintiffs into selling their shares of BITW, which resulted in, among other financial consequences, severe tax consequences for Plaintiffs.

74.     As background, one of the primary negatives of the OTC market is the lack of trading volume, which results in a situation whereby investments traded on the OTC market are less liquid.

75.     On October 30, 2020, Farrell sent an email to investors encouraging investors to sell their shares via OTC to "help a liquid secondary market form." Farrell also encouraged investors to reinvest in BITW after selling their shares, "[n]ot by buying in your brokerage account, but by investing again directly in BITW at NAV [net asset value], *as you have in the past* (via our site or the investor relations team)," which gave the misleading illusion that reinvested funds would enter and exit at NAV, as they had in the past.  This was not true.

76.     Defendants' October 30, 2020, email attached a link to a document entitled "Additional Details on Planned Changes to the Bitwise 10 Private Index Fund." The document referenced a point in time in the future when direct redemptions would cease, which was contrary to the information conveyed in previous communications from Defendants, both by email and direct communications, regarding when redemptions closed and the ability to privately redeem.

77.     At that time, Plaintiffs became skeptical of misleading and contradicting information given by Defendants about BITW and considered redeeming their investments.

13

78.     On November 6, 2020, Farrell invited investors to a "shareholders-only webinar" to "cover what to expect and do when trading starts" and would specifically cover, among other things, "*[h]ow & why to consider selling and then reinvesting via private placement*."

79.     Horsley and Farrell also reached out to Theodore directly to convince Plaintiffs to sell their shares in BITW. Horsley requested to meet over Zoom "to make the case for moving [his] shares and putting a limit sell order in day 1."

80.     On November 11, 2020, Horsley, Farrell, Fusaro, and Theodore participated in a Zoom meeting. Horsley aggressively persuaded Theodore to sell Plaintiffs' shares via OTC because the fund needed shares to provide liquidity to new investors. Theodore expressed his frustration and concern about OTC volatility and stated that Plaintiffs wanted to remain long-term investors and remain in the fund and did not want to be involved in OTC trading and its inherent volatility. Horsley assured Theodore that he could reinvest the same day and maintain "market exposure." They discussed the logistics of wiring funds the same day to maintain market exposure but to invest in the non-OTC fund.

81.     Theodore repeatedly made clear that Plaintiffs had no interest in being involved in OTC and would only reinvest in a privately held and privately redeemable fund.

82.     Horsley repeatedly reassured Theodore that he could re-invest in the non-OTC fund, which would be privately held and privately redeemable.

83.     Horsley then gave Theodore specific instructions on what Plaintiffs needed to do to execute the investment strategy they discussed. Horsley specifically advised Theodore to put one-day limit orders at 1.25 times the NAV and to sell all shares as soon as possible.

14

84. Horsley misled Theodore by stating that BITW was still accepting private placements and omitted that, even though Theodore's new investment would be privately placed, he would only be able to sell via OTC, which Horsley knew Theodore did not want to do.

85. Horsley also misled Plaintiffs by omitting the severe tax consequences they would incur by following his instructions. Indeed, during their many discussions, Horsley never even advised Theodore that this strategy could even have tax ramification for Plaintiffs or that Plaintiffs should consult with a tax expert. Horsley, with a B.S. in Economics from the Wharton School of Finance, would have been well aware that selling, for example, $1M in shares at 1.25 times the NAV and reinvesting immediately but incurring taxes totaling 37.1% (20% IRS long term capital gains, 13.3% New York City and State, 3.8% Medicare for high income) would mean a net loss of $213,750. Nevertheless, Horsley and Bitwise used these aggressive and solely self-serving tactics and advice during this campaign to achieve their goals of the "pump and dump" scheme.

86. The next day, Theodore participated in the "shareholders-only webinar," during which Defendants aggressively encouraged investors to place a "limit order" on day 1 and then reinvest with them. Defendants never mentioned during the webinar or in the emails to investors that, in doing so, they would not be able to redeem shares privately and would be subject to the volatility of the OTC markets.

87. On December 8, 2020, Horsley, Fusaro, and Farrell sent an email assuring investors that "[s]ubscriptions at NAV through private placement will remain open indefinitely, *__alongside__* public trading."

88. In March 2021, relying on Defendants' representations and assurances that private placement would continue to be available, and that Plaintiffs would be able to reinvest privately,

Plaintiffs sold all shares of BITW via OTC, which resulted in tax consequences of approximately $3.84 million owed by Plaintiffs.

89.     Defendants were aware of the substantial and likely risk that such an OTC Fund would trade well below the NAV in the long term due to the same discount that has routinely been applied in valuing the longer established Greyscale Bitcoin OTC Trust. Given that the BITW Fund has high fees of 2.5% and is taxed issuing individual K-1s, the market discounts the net present value of the fees over a long-term horizon and is not willing to pay the NAV for shares in the fund. Nevertheless, Defendants pursued this risky "pump and dump" scheme to create an initial "pop" in the OTC markets and then leave Fund investors consistently under water, as the Fund has consistently traded 35-40% below the NAV for three years.  Defendants were aware of the substantial and likely risk that such an OTC Fund would trade well below the NAV in the long term due to the same discount that has routinely been applied in valuing the longer established Greyscale Bitcoin OTC Trust. Given that the BITW Fund has high fees of 2.5% and is taxed issuing individual K-1s, the market discounts the net present value of the fees over a long-term horizon and is not willing to pay the NAV for shares in the fund. Nevertheless, Defendants pursued this risky "pump and dump" scheme to create an initial "pop" in the OTC markets and then leave Fund investors consistently under water, as the Fund has consistently traded 35-40% below the NAV for three years.

**Plaintiffs Invest in BITW in Reliance on Defendants' Misrepresentations**

90.     Plaintiffs were in direct and personal contact with Horsley and Farrell in connection with Plaintiffs' reinvestment into BITW.

91.     Relying on Defendants' representations and assurances that Plaintiffs would be privately placing funds that could be redeemed at NAV, on March 8 and March 17, 2021,

Plaintiffs signed a total of six subscription agreements ("2021 Subscription Agreements"), thereby reinvesting $4.85 million into BITW. Even though Plaintiffs 2018 investments in the Fund yielded a net profit upon liquidation in 2021, that investment is resolved and is not being litigated. What is being litigated are the false and misleading statements both in the governing trust document, in emails, and most importantly in a 2020 phone call and a 2020 zoom meeting in which Defendants promised Plaintiffs that they would be able to immediately reinvest in a privately held fund (as they had in 2018), however the truth is that Defendants did not have this privately held fund available to reinvest in until approximately 6 months after they had aggressively and successfully persuaded Plaintiffs to reinvest. Defendants were so concerned with continuing to increase their AUM ("assets under management") and to generate fees from Plaintiffs that they disregarded Plaintiff's express desire to not be involved in OTC products.

92.     The 2021 Subscription Agreements were not clear on redemptions of privately placed shares, but Defendants repeatedly assured Plaintiffs that they would be able to redeem privately placed shares at NAV.

93.     Because of Defendants' delayed responses to Theodore's emails, as well as confusing instructions given by Defendants to Plaintiffs regarding the proper forms to fill out, Plaintiffs were forced to purchase fewer shares than they had sold in the weeks prior due to the cryptocurrency market moving higher before money could settle to wire out for reinvestment.

94.     As a result, despite being guaranteed that they would maintain market exposure at all times, by following Defendants' instructions, Plaintiffs missed a significant move up in cryptocurrencies, further harming Plaintiffs.

### Defendants' Deceit is Exposed

95.  On September 9, 2021, Defendants announced via email the launch of two new funds, including "Bitwise 10 Crypto Index Fund (non-OTC Trust)" ("Bitwise non-OTC Fund").

96.  The announcement email explained that "this 'non-OTC' fund does not, and will not, have public trading of its shares. Instead, investors can subscribe and redeem at NAV on a weekly basis, with no lockup."

97.  Recognizing that the release of this new non-OTC fund would create confusion, as Defendants had misled investors, including Plaintiffs, into believing that a non-OTC option already existed, Defendants sent an email update to investors stating that "[a]n updated Private Placement Memorandum reflecting these changes will be available September 20th."

98.  Defendants, however, did not receive an updated Private Placement Memorandum until it was emailed by Farrell to Theodore on February 28, 2024. Only this new private placement memorandum clearly states page 4 under "Redemptions: Currently, the Trust does not offer redemptions."

99.  On February 26, 2024, Theodore emailed Wade Hampton, a private client manager of BAM, and asked when the withdrawal dates were and requested the paperwork required to withdraw.

100.  Defendants did not respond to that email.

101.  Two days later, on February 28, 2024, Theodore followed up on his email, this time sending it to Farrell, as well, and expressed the time sensitive nature of a prompt response, as the withdrawal window for that week had passed because of Defendants' failure to respond.

102.  Contrary to each and every representation and assurance made by Defendants to Plaintiffs, Farrell informed Theodore for the first time that redemptions were only available via

18

OTC, and that Plaintiffs would need to transfer them out of EQ (BAM's transfer agent) and into a brokerage account to sell their shares via OTC.

103.    Between February and March 2024, Theodore, Horsley, and Farrell communicated regarding this issue. During these discussions, Farrell admitted that he had received similar complaints from numerous investors.  As Farrell conceded, investors in the Fund / BITW were upset and frustrated with Defendants' management of the product and that the discount from the NAV when investors sold was typically in the range of 35-45%, and has been as much as 65% below NAV. Theodore and Horsley have lengthy zoom meetings on March 7 and March 26, 2024 to try and resolve the dispute amicably. Horsley showed no sympathy or understanding for having intentionally misled the Mukamal family in this investment. Horsley demonstrated zero value for the client relationship while and offers no apologies.

104.    Plaintiffs had presumed incorrectly that their 2021 investments are privately placed, privately held, and privately redeemable for 3 years. In an identical fashion to the 2018 investments, Plaintiffs continue to receive annual K-1 tax documents, monthly statements reflecting the NAV, and the shares are held on an account login to Bitwise directly (not via a brokerage account).

105.    Thus, despite all prior representations from Defendants, Plaintiffs invested in a product that (1) significantly underperformed, leading to massive financial losses; (2) became an OTC-traded fund, which only compounded the volatility and losses suffered by Plaintiffs; and (3) charged management fees far in excess of those to which Plaintiffs initially agreed.

106.    In fact, concerning the management fees, Seeking Alpha, a leading financial publication, published an article concerning BITW on February 21, 2024, which noted that the fees being charged by BITW were much higher than what was standardly charged. It stated that

Case 1:24-cv-07554     Document 1-1     Filed 10/04/24     Page 57 of 75

"The Fund's management fees are very high and its K-1 tax treatment is a material drawback to ownership." It also stated that "Non-Diversified: 90% of the Fund consists of Bitcoin and Ethereum. By virtue of this large-cap crypto focus, the Fund necessarily misses some of the massive returns that occur in the smaller-cap token space." The article also noted, "Discount/Premium: As a trust, the Fund does not necessarily trade at or near its net asset value ("NAV"). Currently, the Fund trades at a significant discount to its NAV. There is no guarantee that the NAV discount will shrink or that it will not grow even wider." And the article's author concluded in saying, "I am not particularly excited about the Fund given the more affordable options available. The K-1 partnership tax treatment is a material, if not fatal, drawback too (for me at least). If taxes are not an issue, I would SELL the Fund and gain exposure to the underlying cryptocurrencies utilizing more reasonably priced (i.e., lower management fee) options."

107.   Between March 26, 2024 and April 4, 2024, Plaintiffs sold all of their shares of BITW via OTC at an average value of 35.40 per share.  During this time, the NAV – which is what Plaintiffs would have sold at had the fund not converted – was at an average value of 54.45 per share.

108.   Plaintiffs' 2021 investment of $4.85 million was reduced to $3,593,556.14.

109.   At that time that Plaintiff's sold, their investment would have been worth $5,528,433.83 at NAV (representing a whopping 35% difference off of the NAV).

110.   Plaintiffs have been damaged by $1,934,877.69 because of Defendants' false and materially misleading statements and omissions of material facts.

20

## AS AND FOR A FIRST CAUSE OF ACTION
### (Breach of Fiduciary Duty)

111.    Plaintiffs repeat and reallege each of the foregoing paragraphs as though fully set forth herein.

112.    Defendants owed fiduciary obligations to Plaintiffs, including the duties of loyalty, good faith, candor and due care.

113.    The Individual Defendants are principals of BAM, the entity responsible for managing the Fund, now BITW.

114.    Defendants breached their fiduciary obligations by making repeated false and/or misleading statements and omissions to Plaintiffs regarding the nature and liquidity of the Fund and BITW's investments. These false and/or misleading statements and omissions were made to Plaintiffs in response to Plaintiffs' specific inquiries for the purpose of keeping Plaintiffs' investments in the Fund and BITW by concealing the truth in violation of Defendants' fiduciary duties.

115.    Moreover, Defendants caused the Fund and BITW to be managed in a manner that was inconsistent with their fiduciary duties towards Plaintiffs as investors in the Fund and BITW.

116.    Acting in their own self-interest and in knowing violation of, or reckless and bad faith disregard of, the law, Defendants knowingly increased their own fees and converted the nature of the Fund from a private placement to an OTC-traded vehicle.

117.    These changes enriched Defendants at the expense of Plaintiffs.

118.    Defendants further owed a fiduciary duty to Plaintiffs to supervise the issuance and content of the Fund and BITW's documents and statements made on the Fund and BITW's behalf to ensure that such documents and statements were truthful and accurate and that such

statements and documents conformed to applicable securities laws. Defendants, however, breached their fiduciary duties by allowing the Fund and BITW to issue and disseminate statements that were materially false and/or misleading and failed to disclose material information concerning the Fund and BITW.

119.    Plaintiffs were injured by Defendants' breaches of fiduciary duty, insofar as the misstatements and omissions perpetrated by Defendants caused Plaintiffs to keep their investments in the Fund and BITW and contributed directly to the injury that Plaintiffs suffered.

120.    As a direct and proximate result of Defendants' breaches of their fiduciary duties, Plaintiffs have suffered damages in an amount to be determined at trial.

121.    The Individual Defendants' conduct was willful, wanton, and malicious, and warrants the imposition of punitive damages.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Negligence)

122.    Plaintiffs repeat and reallege each of the foregoing paragraphs as though fully set forth herein.

123.    In addition to the duties set forth above, Defendants owed Plaintiffs a duty to exercise reasonable care, competence, and diligence in the management of the Fund and BITW, and to act in a manner consistent with industry customs, practice, and standards.

124.    Defendants breached their duties owed to Plaintiffs by soliciting investments in a type of fund that Plaintiffs clearly and unambiguously stated they did not want to invest in, by making material misrepresentations and/or omissions to Plaintiffs regarding the availability of private investments and redemptions in that fund, and failing to comply with industry customs, practice, and standards in connection therewith, including but not limited to failing to comply

with all applicable federal and state securities laws, rules, and regulations as to the suitability of these investments.

125.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages in an amount to be determined at trial, including but not limited to millions of dollars lost on their investments and unexpected tax consequences.

126.    The Individual Defendants' conduct was willful, wanton, and malicious, and warrants the imposition of punitive damages.

### AS AND FOR A THIRD CAUSE OF ACTION
#### (Negligent Misrepresentation)

127.    Plaintiffs repeat and reallege each of the foregoing paragraphs as though fully set forth herein.

128.    Defendants owed duties of care and loyalty to Plaintiffs because Plaintiffs had entrusted their capital to them, and reposed trust and confidence in them. Defendants accepted Plaintiffs' trust and confidence, forming a fiduciary relationship.

129.    In connection with Plaintiffs' consideration of BITW, Defendants provided false and/or misleading information, or caused such false and/or misleading information to be provided, both before Plaintiffs purchased shares in BITW and later, once Plaintiffs became shareholders, for the purpose of keeping Plaintiffs as shareholders in BITW.

130.    Defendants intended Plaintiffs to rely upon the false and/or misleading information in deciding whether to invest, or remain in, BITW.

131.    Defendants failed to exercise reasonable care or competence in obtaining or communicating the information supplied to Plaintiffs. Defendants acted negligently and carelessly.

132.    Plaintiffs justifiably relied upon the information supplied by Defendants in deciding to make and retain their investments in BITW, and suffered harm as a result. Plaintiffs could not have known that the Defendants' representations were false, as Defendants concealed the truth during Plaintiffs' due diligence and thereafter.

133.    If Plaintiffs had known the truth, they would not have made their investments in BITW, would not have continued to invest in BITW, and would have redeemed their investments.

134.    As a direct and proximate result of Defendants' conduct, Plaintiffs have sustained damages in an amount to be proven at trial.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Fraud)

135.    Plaintiffs repeat and reallege each of the foregoing paragraphs as though fully set forth herein.

136.    Defendants knowingly, or recklessly, made false and/or misleading material statements and omissions to Plaintiffs prior to Plaintiffs' investments in BITW, for the purpose of inducing Plaintiffs to invest in BITW.

137.    In connection with their fraudulent scheme, Defendants continued to disseminate false and/or misleading statements and omissions to Plaintiffs after Plaintiffs made their investments for the purpose of concealing the truth to induce Plaintiffs, in reliance on the false statements and omissions, to retain their investment interests in BITW.

138.    Defendants had a duty to disclose material information, such as the magnitude and liquidity of Plaintiffs' investments, because Defendants owe Plaintiffs duties of care and loyalty with respect to the management of capital Plaintiffs entrusted to them.

139.    Defendants also had a duty to not tell half-truths and to supply full information so that statements made by Defendants would not be misleading.

140.    Defendants also had a duty to disclose material omissions because they had superior and peculiar knowledge not available to Plaintiffs.

141.    Defendants intended to defraud Plaintiffs. As stated above, Defendants made false and/or misleading representations and omissions with actual knowledge of their falsity and/or reckless disregard for the truth at the time they were made.

142.    Plaintiffs reasonably and justifiably relied on these misstatements and/or omissions in deciding to invest in BITW, and in maintaining their investments.

143.    Plaintiffs actively sought clarification from Defendants concerning material aspects of the Fund and BITW, including whether a private placement option would continue to be available. Plaintiffs could not have known that Defendants' representations were false, as Defendants concealed the truth during Plaintiffs' due diligence and thereafter. The documents that Defendants provided to Plaintiffs were confusing and misleading, and Defendants seemed to plausibly explain and clarify that Plaintiffs investment would be privately placed and privately redeemable. Plaintiffs discovered the truth only after Defendants began marketing the non-OTC fund that Defendants had misled Plaintiffs into believing already existed and invested in.

144.    If Plaintiffs had known the truth, they would have redeemed their investments before the conversion of the Fund to BITW, they would not have made their investments in BITW, and would not have continued to invest in BITW.

145.    By virtue of the foregoing, Defendants have committed fraud.

146.    The fraudulent conduct of Defendants, as outline above, was committed purposefully, knowingly, recklessly, and without regard for the rights and interests of Plaintiffs.

147.     As a direct and proximate result of Defendants' material misrepresentations and omissions, Plaintiffs have found their capital invested in far riskier and less liquid investments than they otherwise would have chosen and have been denied the ability to redeem their investments as represented. These factors resulted in significant financial losses to Plaintiffs.

148.     Plaintiffs are therefore entitled to damages in an amount to be determined at trial.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**(Conspiracy to Commit Fraud)**

149.     Plaintiffs repeat and reallege each of the foregoing paragraphs as though fully set forth herein.

150.     As alleged above, Defendants committed acts of fraud by knowingly or recklessly making false and/or misleading statements and omissions to Plaintiffs in connection with Plaintiffs' investments in BITW.

151.     Defendants agreed and conspired together to commit fraud and engage in a course of material misrepresentations and omissions to conceal the fraudulent acts.

152.     Defendants intentionally and knowingly committed overt acts in furtherance of this conspiracy, including by making the misrepresentations detailed above.

153.     As a direct and proximate result of Defendants' conduct, Plaintiffs have sustained damages in an amount to be proven at trial.

**AS AND FOR A SIXTH CAUSE OF ACTION**
**(Violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder)**

154.     Plaintiffs repeat and reallege each of the foregoing paragraphs as though fully set forth herein.

26

155. Defendants knowingly, or recklessly, made false and/or misleading material statements and omissions of material fact to Plaintiffs for the purpose of inducing Plaintiffs to sell their shares of BITW and reinvest in BITW.

156. Defendants' material misrepresentations included, *inter alia*, stating that private placement and redemptions would continue to be available as an option alongside public trading.

157. These representations were false at the time they were made.

158. Defendants' material omissions included, *inter alia*, failing to disclose that they knew private placement would not be available for Plaintiffs to reinvest.

159. Each of the foregoing misrepresentations and omissions were material and would have been important to the investment decisions of a reasonable investor.

160. Defendants had a duty to disclose material information because they owed Plaintiffs a fiduciary duty and received fees for the management of BITW.

161. Defendants made these false and/or misleading representations and omissions to Plaintiffs with actual knowledge of their falsity and/or reckless disregard for the truth at the time they were made.

162. Defendants, as seasoned investment professionals, were well aware of the substantial commissions and fees they stood to earn upon the sale and reinvestment of Plaintiffs' shares in BITW, and that Plaintiffs did not want to be involved in an OTC-traded investment, but pressured Plaintiffs into selling and reinvesting regardless.

163. Plaintiffs had no way of knowing this information absent full and fair disclosure by Defendants.

164. Defendants made these material misrepresentations or omitted to disclose material facts with the intention of inducing Plaintiffs, in reliance therein, to sell their shares in BITW and to reinvest in BITW.

165. Plaintiffs reasonably and justifiably relied on these misstatements and omissions in deciding to sell their shares in BITW and to reinvest in BITW.

166. By virtue of the foregoing, Defendants violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder in that they, directly or indirectly, by use of the means or instrumentalities of interstate commerce and/or the mails, or of a facility of a national securities exchange, knowingly or reckless employed devices, schemes and artifices to defraud, made untrue statements of material facts or omitted to state facts that they were under a duty to speak, and engaged in acts of fraud and deceit upon Plaintiffs, all in connection with the purchase or sale of securities, i.e., the shares of BITW.

167. Plaintiffs were harmed by the wrongful, predatory and illegal conduct of the Individual Defendants.

168. As a direct and proximate result of Defendants' material misrepresentations and omissions, Plaintiffs were forced to incur substantial losses in the sale of their shares in 2024.

169. Plaintiffs are therefore entitled to damages in an amount to be determined at trial.

170. Defendants conduct was willful, wanton, and malicious, and warrants the imposition of punitive damages.

**WHEREFORE**, Plaintiffs demands judgment against Defendants:

(a)    on the first cause of action, for damages against Defendants in an amount to be determined at trial;

(b)    on the second cause of action, for damages against Defendant in an amount to be determined at trial;

(c)    on the third cause of action, for damages against Defendants in an amount to be determined at trial;

(d)    on the fourth cause of action, for damages against Defendants in an amount to be determined at trial;

(e)    on the fifth cause of action, for damages against Defendants in an amount to be determined at trial; and

(f)    on the sixth cause of action, for damages against Defendants in an amount to be determined at trial;

(g)    on all causes of action, for an award of the costs, disbursements, legal fees, and other expenses incurred by Plaintiffs, together with such other and further relief as the Court deems just and proper.

Dated:  Uniondale, New York
        August 9, 2024

WESTERMAN BALL EDERER
MILLER ZUCKER & SHARFSTEIN, LLP

By:  *Andrew S. Lewner*
       Andrew S. Lewner, Esq.
1201 RXR Plaza
Uniondale, New York 11556
(516) 622-9200
*Attorneys for Plaintiffs*

03070213

29

## VERIFICATION

STATE OF NEW YORK ~~IL~~ )
) ss.:
COUNTY OF NEW YORK ) ~~Cook~~

    **Theodore Mukamal**, being duly sworn, deposes and says:

    1.    I am the Manager of plaintiff Vandelay Industries TM LLC, a Wyoming limited liability company.

    2.    I have read the within Amended Complaint and know the contents thereof; and same is true to my knowledge, except as to the matters therein stated to be alleged upon information and belief, and as to those matters, I believe them to be true.

    3.    This Verification is made by deponent because Plaintiff is a limited liability company and I am the Manager thereof.

                                  **THEODORE MUKAMAL**

Sworn to before me this
_9_ day of August, 2024

_Ryan J. Cunnea_
Notary Public

08/09/2024

RYAN JAMES CUNNEA
Official Seal
Notary Public - State of Illinois
My Commission Expires Mar 16, 2027

WESTERMAN BALL EDERER MILLER ZUCKER & SHARFSTEIN, LLP 1201 RXR Plaza Uniondale, NY 11556

# AFFIRMATION OF SERVICE

| | |
|---|---|
| Client's File No.: | |
| Index Number: | **653436/2024** |
| Date Filed: | **July 8, 2024** |
| Court Date: | |
| Amended D/F: | **08/23/2024** |

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

*VANDELAY INDUSTRIES TM LLC, et al.,*

*Plaintiff*

*vs*

*BITWISE HOLD 10 PRIVATE INDEX FUND, LLC et al.,*

*Defendant*

The undersigned affirms and says: that affirmant is not a party to this action, is over 18 years of age and resides in the State of   California

That on the following date:   September 5, 2024   , at the following time:   1:00 PM   ,

at   C/O BITWISE INVESTMENT ADVISORS, LLC, 250 MONTGOMERY STREET, SUITE 200, SAN FRANCISCO, CA 94111   affirmant served the within

Summons, Verified Complaint, Amended Summons, Amended Verified Complaint and Notice of Electronic Filing (Mandatory Case) - Form EFM -1

[X] Papers so served were properly endorsed with the Index Number and date of filing.

**Upon:   HUNTER HORSLEY**

[ ] **Individual**   By delivering a true copy thereof to said recipient personally; affirmant knew the person so served to be the individual described therein.

[X] **Responsible Person**   By delivering to and leaving with   Y.Q.   ,   Office Clerk/Authorized Person
**Relationship**
a true copy thereof, a person of suitable age and discretion. Said premises being the defendant / respondent's
[ ] dwelling place   [X] place of business/employment   [ ] last known address within the State.   [ ] usual place of abode

[ ] **Corporation LLC / LLP**   By delivering to and leaving with   said individual to be
who specifically stated he/she was authorized to accept service on behalf of the Corporation/Government Agency/Entity.

[ ] **Affixing To Door**   By affixing a true copy thereof to the door, being the defendant/respondent's   [ ] dwelling place   [ ] place of business/employment
[ ] last known address within the State.   [ ] usual place of abode

[ ] **Previous Attempts**   Deponent previously attempted to serve the above named defendant/respondent on:

**Description of Recipient**   Sex: Female   Color of skin   Asian   Color of hair: Black   Age: 26 - 35 Yrs.   Height: 5ft 4inch - 5ft 8inch
Weight:   131-160 Lbs.   Other Features:

[X] **Mail**   A copy thereof was deposited in a postpaid, properly addressed envelope, marked "Personal and Confidential" in a depository maintained by the U. S. P. S. and mailed First Class mail to the above address   September 10, 2024   .
on

[ ] **WITNESS FEES**   Subpoena Fee Tendered in the amount of  $.

[X] **MILITARY SERVICE**   I asked the person spoken to whether defendant was in active military service of the United States in any capacity whatever and received a negative reply. The source of my information and the grounds of my belief are the conversations and observations above narrated.

[ ] **Other**

I affirm on 09/10/2024 under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

PROCESS SERVER - PRINT NAME BELOW SIGNATURE
Carlos Castillo Flores

PROCESS SERVER LICENSE #

*Court Support, Inc.*, 265 Post Ave #150, Westbury, NY 11590 License #1382542   **Work Order #  1489685**

1 of 1

*Westerman Ball Ederer Miller Zucker & Sharfstein, LLP 1201 RXR Plaza Uniondale, NY 11556*

# AFFIRMATION OF SERVICE

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| Client's File No.: | |
| Index Number: | **653436/2024** |
| Date Filed: | **July 8, 2024** |
| Court Date: | |
| Amended D/F: | **08/23/2024** |



*VANDELAY INDUSTRIES TM LLC, et al.,*

Plaintiff

*vs*

*BITWISE HOLD 10 PRIVATE INDEX FUND, LLC et al.,*

Defendant

The undersigned affirms and says: that affirmant is not a party to this action, is over 18 years of age and resides in the State of   California

That on the following date:  September 5, 2024 , at the following time:  1:00 PM  ,

at  C/O BITWISE INVESTMENT ADVISORS, LLC, 250 MONTGOMERY STREET, SUITE 200, SAN FRANCISCO, CA 94111  affirmant served the within

Summons, Verified Complaint, Amended Summons, Amended Verified Complaint and Notice of Electronic Filing (Mandatory Case) - Form EFM -1

[X] Papers so served were properly endorsed with the Index Number and date of filing.

**Upon:**  **JAMES FARRELL**

[ ] **Individual**  By delivering a true copy thereof to said recipient personally; affirmant  knew the person so served to be the individual described therein.

[X] **Responsible Person**  By delivering to and leaving with                    Y.Q.                ,    Office Clerk/Authorized Person
                                                                                                                        **Relationship**
a true copy thereof, a person of suitable age and discretion. Said premises being the defendant / respondent's
[ ] dwelling place   [X] place of business/employment   [ ] last known address within the State. [ ] usual place of abode

[ ] **Corporation LLC / LLP**  By delivering to and leaving with                         said individual to be
who specifically stated he/she was authorized to accept service on behalf of the Corporation/Government Agency/Entity.

[ ] **Affixing To Door**  By affixing a true copy thereof to the door, being the defendant/respondent's   [ ] dwelling place   [ ] place of business/employment
[ ] last known address within the State. [ ] usual place of abode

[ ] **Previous Attempts**  Deponent previously attempted to serve the above named defendant/respondent on:

**Description of Recipient**  Sex: Female    Color of skin   Asian    Color of hair:  Black    Age:  26 - 35 Yrs.    Height:  5ft 4inch - 5ft 8inch
Weight:   131-160 Lbs.    Other Features:

[X] **Mail**  A copy thereof was deposited in a postpaid, properly addressed envelope, marked "Personal and Confidential" in a depository maintained
by the U. S. P. S. and mailed First Class mail to the above address        September 10, 2024  .
on

[ ] **WITNESS FEES**  Subpoena Fee Tendered in the amount of  $.

[X] **MILITARY SERVICE**  I asked the person spoken to whether defendant was in active military service of the United States in any capacity whatever and
received a negative reply. The source of my information and the grounds of my belief are the conversations and observations above
narrated.

[ ] **Other**

I affirm on 09/10/2024 under the penalties of perjury under the
laws of New York, which may include a fine or imprisonment,
that the foregoing is true, and I understand that this document
may be filed in an action or proceeding in a court of law.

PROCESS SERVER - PRINT NAME BELOW SIGNATURE
Carlos Castillo Flores

PROCESS SERVER LICENSE #

*Court Support, Inc., 265 Post Ave #150, Westbury, NY 11590 License #1382542*    **Work Order #  1489689**

1 of 1

*Westerman Ball Ederer Miller Zucker & Sharfstein, LLP 1201 RXR Plaza Uniondale, NY 11556*

# AFFIRMATION OF SERVICE

|  |  |
|---|---|
| Client's File No.: | |
| Index Number: | **653436/2024** |
| Date Filed: | **July 8, 2024** |
| Court Date: | |
| Amended D/F: | **08/23/2024** |

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

*VANDELAY INDUSTRIES TM LLC, et al.,*

*Plaintiff*

*vs*

*BITWISE HOLD 10 PRIVATE INDEX FUND, LLC et al.,*

*Defendant*

The undersigned affirms and says: that affirmant is not a party to this action, is over 18 years of age and resides in the State of   California

That on the following date:   September 5, 2024   , at the following time:   1:00 PM   ,

at   C/O BITWISE INVESTMENT ADVISORS, LLC, 250 MONTGOMERY STREET, SUITE 200, SAN FRANCISCO, CA 94111   affirmant served the within

Summons, Verified Complaint, Amended Summons, Amended Verified Complaint and Notice of Electronic Filing (Mandatory Case) - Form EFM -1

[X] Papers so served were properly endorsed with the Index Number and date of filing.

**Upon:  MATT HOUGAN**

[ ] **Individual**   By delivering a true copy thereof to said recipient personally; affirmant  knew the person so served to be the individual described therein. ·

[X] **Responsible**   By delivering to and leaving with          Y.Q.          ,   Office Clerk/Authorized Person
**Person**                                                                                   **Relationship**
a true copy thereof, a person of suitable age and discretion. Said premises being the defendant / respondent's
[ ] dwelling place   [X] place of business/employment   [ ] last known address within the State. [ ] usual place of abode

[ ] **Corporation**   By delivering to and leaving with                   said individual to be
**LLC / LLP**   who specifically stated he/she was authorized to accept service on behalf of the Corporation/Government Agency/Entity.

[ ] **Affixing**   By affixing a true copy thereof to the door, being the defendant/respondent's   [ ] dwelling place   [ ] place of business/employment
**To Door**   [ ] last known address within the State. [ ] usual place of abode

[ ] **Previous**   Deponent previously attempted to serve the above named defendant/respondent on:
**Attempts**

**Description**   Sex: Female   Color of skin   Asian   Color of hair:  Black   Age:  26 - 35 Yrs.   Height:  5ft 4inch - 5ft 8inch
**of Recipient**   Weight:   131-160 Lbs.   Other Features:

[X] **Mail**   A copy thereof was deposited in a firstpaid, properly addressed envelope, marked "Personal and Confidential" in a depository maintained
by the U. S. P. S. and mailed First Class mail to the above address          September 10, 2024          .
on

[ ] **WITNESS**   Subpoena Fee Tendered in the amount of  $.
**FEES**

[X] **MILITARY**   I asked the person spoken to whether defendant was in active military service of the United States in any capacity whatever and
**SERVICE**   received a negative reply. The source of my information and the grounds of my belief are the conversations and observations above
narrated.

[ ] **Other**

I affirm on 09/10/2024 under the penalties of perjury under the
laws of New York, which may include a fine or imprisonment,
that the foregoing is true, and I understand that this document
may be filed in an action or proceeding in a court of law.

PROCESS SERVER - PRINT NAME BELOW SIGNATURE
Carlos Castillo Flores

PROCESS SERVER LICENSE #

*Court Support, Inc., 265 Post Ave #150, Westbury, NY 11590 License #1382542*          **Work Order #  1489688**

1 of 1

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
**Attorney:** Westerman Ball Ederer Miller Zucker & Sharfstein, LLP
**Address:** 1201 RXR Plaza Uniondale, NY 11556

**Job #:** 1489678

| | |
|---|---|
| VANDELAY INDUSTRIES TM LLC, et al., | **Index Number:** 653436/2024 |
| **vs** _Plaintiff_ | **Client's File No.:** |
| BITWISE HOLD 10 PRIVATE INDEX FUND, LLC et al., | **Court Date:** |
| _Defendant_ | **Amended D/F:** 08/23/2024 |

**Baldeo C. Drepaul**, affirms and says:

# AFFIRMATION OF SERVICE

Affirmant is not a party herein; is over the age of 18 years and resides in the State of New York.

On **9/5/2024**, at **1:03 PM** at: **19 WEST 44TH STREET, SUITE 715, NEW YORK, NY 10036** Affirmant served the within **Summons, Verified Complaint, Amended Summons, Amended Verified Complaint and Notice of Electronic Filing (Mandatory Case) - Form EFM -1**

On: **TEDDY FUSARO**, therein named.

Said documents were conformed with index number and date of filing endorsed thereon.

☒ **#1 INDIVIDUAL**
By delivering a true copy of each to said recipient personally; Affirmant knew the person so served to be the person described in as said recipient therein.

☒ **#2 DESCRIPTION**
**Sex:** Male          **Color of skin:** White          **Color of hair:** Black/Gray          **Glasses:** No
**Age:** 36–50          **Height:** 6ft Over          **Weight:** 161-200 Lbs.          **Other Features:** Beard

☒ **#3 MILITARY SERVICE**
I asked the person spoken to whether subject was in active military service of the United States or the State of New York in any capacity whatever and received a negative reply. The source of my information and the grounds of my belief are the conversations and observations above narrated.

☐ **#4 WITNESS FEES**
Subpoena Fee Tendered in the amount of $ .

☐ **#5 OTHER**

I affirm on 09/05/2024 under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

Baldeo C. Drepaul
DCA License# 2093579



_COURT SUPPORT, INC., 265 POST AVE #150, WESTBURY, NY 11590 LICENSE #1382542_

1 of 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------------- x

VANDELAY INDUSTRIES TM LLC,
VANDELAY INDUSTRIES KM LLC,                         Index No: 653436/2024
VANDELAY INDUSTRIES AM LLC,

**STIPULATION**

Plaintiffs,

-against-

BITWISE HOLD 10 PRIVATE INDEX FUND, LLC
BITWISE ASSET MANAGEMENT, INC, BITWISE 10
CRYPTO INDEX FUND, BITWISE INVESTMENT
ADVISORS, LLC, HUNTER HORSLEY, MATT
HOUGAN, TEDDY FUSARO, and JAMES FARRELL

Defendants.

-------------------------------------------------------------------------- x

IT IS HEREBY STIPULATED AND AGREED, by and between Plaintiffs Vandelay

Industries TM LLC, Vandelay Industries KM LLC and Vandelay Industries AM LLC,

("Plaintiffs") on the one hand, and Defendants Bitwise Hold 10 Private Index Fund, LLC,

Bitwise Asset Management, Inc., Bitwise 10 Crypto Index Fund, Bitwise Investment Advisors,

LLC, Hunter Horsley, Matt Hougan, Teddy Fusaro, and James Farrell ("Defendants") on the

other hand (referenced together as the "Parties"), each through their undersigned attorneys as

follows:

It is hereby stipulated and agreed between the Parties' undersigned counsel that

Defendants shall have an additional fourteen (14) days to respond (by October 8, 2024) to the

complaint in the above captioned action.

By agreeing to this stipulation, Defendants do not consent to jurisdiction and reserve all rights to challenge jurisdiction and/or to seek removal to federal court. Defendants agree to waive all defenses relating to service of the complaint.

**ACCEPTED AND AGREED:**

Dated: New York, New York
        September 25, 2023

**By:** */s/ Douglas Baumstein*        **By:** */s/ Andrew S. Lewner*

Douglas Baumstein, Esq.        Andrew S. Lewner, Esq.
William G. McKitterick, Esq.

MINTZ, LEVIN, COHN, FERRIS,        WESTERMAN BALL EDERER
GLOVSKY, AND POPEO, P.C.        MILLER ZUCKER & SHARFSTEIN, LLP
919 Third Avenue, 38th Flood        1201 RXR Plaza
New York, New York 10022        Uniondale, New York 11556
(212) 692-6734        (516) 622-9200
(212) 692-6245

dbaumstein@mintz.com        alewner@westermanllp.com
wgmckitterick@mintz.com

*Attorneys for Defendants*        *Attorney for Plaintiff*

2